A1c Doris REW, Plaintiff,
v.
Col. John D. WARD et al.,
Defendants.

No. 75-011 Civil.

United States District Court,
D. New Mexico.

July 31, 1975.

Thomas E. Horn, Legal Director N.M. Civil Liberties Union, Albuquerque, N. M., John H. Vaisey, American Civil Liberties Union, San Francisco, Cal., for plaintiff.

Victor R. Ortega, U. S. Atty., James B. Grant, Asst. U. S. Atty., for defendants.

## MEMORANDUM OPINION

BRATTON, District Judge.

This action seeks to declare unlawful plaintiff's administrative discharge from the United States Air Force pursuant to Air Force Manual [AFM] 39–10, para. 3–8 1 (June 28, 1974), as having been effected without the procedural safeguards afforded by the due process clause of the fifth amendment.

Plaintiff, Doris A. Rew, was an Airman First Class stationed at Holloman Air Force Base, New Mexico. On June 8, 1973, she enlisted for six years of active duty. Airman Rew is now twenty years old, black, and her home is Richmond, California. Defendant, Col. John D. Ward, is the Base Commander of Holloman Air Force Base. Lt. Gen. Charles W. Carson, Jr., is the Commander of the 12th Air Force and in the chain of the command of Airman Rew. The defendant, Hon. John L. McLucas is Secretary of the Air Force and ultimately responsible for the conduct of the personnel in the chain of command of the plaintiff and all Air Force regulations and procedures.

### I.

On October 2, 1974, the Air Force initiated action to administratively discharge Airman Rew under the provisions of AFM 39–10.[1] On October 11, 1974, Col. Ward suspended the discharge action because of favorable reports from Airman Rew's duty supervisors indicating a change in attitude and because of her desire to remain in the Air Force. At that time she was given a 90 day probation period in which to improve her duty performance and off-duty conduct. At the end of 90 days her performance was to be reevaluated and unless her conduct had improved the AFM 39–10 action would be reinstituted. On December 2, 1974, a meeting was held to discuss information concerning further alleged infractions by Airman Rew, and it was decided to renew processing of her administrative discharge.[2] On December 11, 1974, Col. Ward vacated the probationary period and approved Airman Rew's discharge. Because of some doubt as to whether the decision to vacate the probationary period had been received and understood by Airman Rew, on January 3, 1975, Col. Ward issued a letter to the plaintiff informing her of the reasons for which he was vacating the 90 day probationary period and that he was directing her immediate discharge in accordance with AFM 39–10.[3]

Airman Rew's discharge was initially scheduled to be effected on January 6, 1975, but was changed to January 7th. A temporary restraining order was issued by this court on January 7th enjoining the discharge, and it was later ordered extended to January 27, 1975. Following evidentiary hearings on the matter, on January 27, 1975, plaintiff's

---

1. In support of this action the squadron commander listed sixteen incidents: (1) two nonjudicial punishments issued pursuant to Article 15, Uniform Code of Military Justice; (2) one letter of reprimand from the commander of her duty section; (3) three counseling forms from supervisors detailing substandard performance; and (4) ten statements from various supervisors and agencies commenting on derogatory conduct. The substance of these incidents was failure to wear her shirt tucked inside her fatigue pants when outside the dormitory, answering disrespectfully to a superior, failure to comply with room inspection, violation of the rule that dormitory doors must be closed when visiting with a group of men at the dorm entrance, oversleeping so as to be late for bay orderly, failing to accomplish an assigned task at her duty section before departure contrary to orders, reporting late for duty, depositing her personal trash in the bay orderly trash can, sleeping on duty, and failure to report for a dental appointment.

2. These additional alleged infractions were baby sitting a child in her dormitory room contrary to regulations and the possession and use of an illegal drug.

3. The reasons furnished Airman Rew for vacating the probationary period were the two incidents listed in note 2, *supra*, plus an additional incident of alleged possession and use of an illegal drug occurring on December 25, 1974.

motion for preliminary injunction was denied.[4] Airman Rew was discharged that same day. In accordance with AFM 39–10, para. 3–8 1(3)(e), Airman Rew was furnished an honorable discharge certificate, DD Form 256AF.

## II.

■ As a threshold matter the defendants maintain that the plaintiff is first required to exhaust her administrative remedy before the Air Force Board for Correction of Military Records [BCMR], AF Reg. 31–3 (October 21, 1970, as amended), and 32 C.F.R. §§ 865.1 to 865.9 (1974), before suing in the district courts.[5]

Much has been written on this question by the academic community [6] and there is considerable variance in approaches to the exhaustion requirement among the circuit courts of appeal.[7]

The Third and District of Columbia Circuits have found that the federal courts have jurisdiction and that the trial court should retain jurisdiction but stay consideration until administrative remedies are exhausted. An exception obtains where there are "special circumstances" dictating immediate judicial review. *Nelson v. Miller*, 373 F.2d 474 (3rd Cir. 1967); *Sohm v. Fowler*, 124 U.S.App.D.C. 382, 365 F.2d 915 (1966).

In *Reed v. Franke*, 297 F.2d 17 (4th Cir. 1961), the court determined that its trial courts have jurisdiction where the plaintiff has a substantial claim that military regulations or procedures violate constitutional rights. However, the court ordered exhaustion because the plaintiff's complaint was that he did not have a right to a hearing and by pursuing his administrative remedy he got such a hearing thus curing any constitutional infirmity. Much to the same effect is the Eighth Circuit holding in *Horn v. Schlesinger*, 514 F.2d 549 (8 Cir. 1975), requiring exhaustion except where "grave constitutional rights seem imperiled."

The Fifth Circuit has refused to take jurisdiction of military discharge complaints until all available administrative remedies are exhausted. *Stanford v. United States*, 413 F.2d 1048 (5 Cir. 1969); *Tuggle v. Brown*, 362 F.2d 801 (5 Cir. 1966), *cert. denied*, 385 U.S. 941, 87 S.Ct. 311, 17 L.Ed.2d 220 (1966); *McCurdy v. Zackert*, 359 F.2d 491 (5 Cir. 1966), *cert. denied*, 385 U.S. 903, 87 S.Ct. 212, 17 L.Ed.2d 133 (1966). An exception to this rule is suggested where the delay caused by administrative review could have a "substantial deleterious effect" on the plaintiff's future career and the complaint raises substantial constitutional issues as to procedural defects in military regulations over which the BCMR has no particular expertise. *Hodges v. Callaway*, 499 F.2d 417, 421 n. 9, 422 n. 14 (5 Cir. 1974).

Yet another approach is taken by the Ninth Circuit in *Schwartz v. Covington*, 341 F.2d 537 (9 Cir. 1965), where the court stayed a discharge proceeding pending predischarge review by the BCMR.

4. It was there held that:

(1) The court has jurisdiction of the subject matter and the parties to this action, 28 U.S.C.A. §§ 1331, 1346(a), 1361, 2201 and 2202, including the jurisdiction to declare Airman Rew's discharge a nullity and order her reinstated in the Air Force with back pay and other allowances, and for the correction of military records, if the defendants should later discharge her and she should subsequently prevail on the merits, *Rew v. Ward*, No. 75–011 Civil (Mem.Op. pp. 3–4, filed Jan. 30, 1975); and

(2) On the facts and circumstances of this case, Airman Rew failed to demonstrate the extraordinary irreparable injury required by *Sampson v. Murray*, 415 U.S. 61, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974), as necessary to justify issuance of a preliminary injunction, *Rew v. Ward*, *supra*, (Mem.Op. pp. 7–9).

5. Counsel have stipulated that plaintiff has no remedy before the Air Force Discharge Review Board, 32 C.F.R. §§ 865.100 to 865.-107 (1974), that must be exhausted. The Discharge Review Board has authority only to reexamine the *type* of discharge and not the *fact* of discharge. 32 C.F.R. § 865.-101(a). Moreover, the Board cannot grant relief such as reinstatement with back pay as demanded by the plaintiff here. 32 C.F.R. § 865.101(b). *See Bard v. Seamans*, 507 F.2d 765, 769 n. 11 (10th Cir. 1974).

6. Some of the more helpful law review articles on the issue are Glosser and Rosenberg, *Military Boards: Administrative Process And Review By the United States Court of Claims*, 23 Am.U.L.Rev. 391 (1973); Lunding, *Judicial Review of Military Administrative Discharges*, 83 Yale L.J. 33 (1973); Sherman, *Judicial Review of Military Determinations and the Exhaustion of Remedies Requirement*, 55 Va.L.Rev. 483 (1969); Everett, *Military Administrative Discharges— The Pendulum Swings*, 1966 Duke L.J. 41.

7. The Court of Appeals for the Second Circuit has held that there is no jurisdiction until administrative remedies are exhausted. *Michaelson v. Herren*, 242 F.2d 693 (1957).

The Court of Appeals for the Tenth Circuit has determined that exhaustion before the BCMR is required even though a plaintiff challenges his discharge on constitutional grounds. *Bard v. Seamans*, 507 F.2d 765, 770 (10 Cir. 1974). However, *Bard* also held that resort to the BCMR is not demanded where "to do so would be futile." *Id.* at 769. On the present record the conclusion is inescapable that for the plaintiff to seek relief by appeal to the BCMR would be an exercise in total futility.

The doctrine of exhaustion of administrative remedies is fully discussed in *McKart v. United States*, 395 U.S. 185, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1969), which points out that "[a]pplication of the doctrine to specific cases requires an understanding of its purpose and of the particular administrative scheme involved." *Id.* at 193, 89 S.Ct. at 1662. Accordingly, the exercise of the court's discretion with regard to the exhaustion defense herein necessarily entails investigation of the following factors: (1) the adequacy of the remedy before the BCMR; and (2) will requiring the plaintiff to pursue her administrative remedy serve the policies underpinning the doctrine. To this should be added a third factor concerning the government's interest in limited judicial interference in military matters. *See Schlesinger v. Councilman,* 420 U.S. 738, 95 S.Ct. 1300, 43 L.Ed.2d 591 (1975); *Orloff v. Willoughby*, 345 U.S. 83, 73 S.Ct. 534, 97 L. Ed. 842 (1953).

*McKart* refers to these purposes for the exhaustion requirement, among others: avoiding premature interruption of the administrative process, in recognition that it is desirable that the agency develop a record and have the opportunity to exercise its discretion and apply its expertise; recognizing that the exhaustion doctrine is an "expression of executive and administrative autonomy" and that the courts should not interfere with the agency until it has completed its action or exceeded its jurisdiction; practical notions of judicial efficiency, since the complaining party may vindicate his rights administratively and the courts may never have to intervene; permitting an administrative agency to discover and correct its own errors; and, avoiding the flouting of the administrative process that can weaken the agency's effectiveness by encouraging people to ignore its procedures.

When one scrutinizes the specific administrative system here involved, the Air Force Board for Correction of Military Records, in light of the foregoing policies, as *McKart* instructs the court to do, it becomes all too apparent that due to fiscal neglect and lack of legislative reform the BCMR is totally inept at handling with fairness questions such as those raised by the plaintiff herein.

The first step in processing an appeal to the BCMR is for the petitioner to obtain her military records. Because the records could be kept at one of several locations, it is often difficult to locate where one's records are housed. Experience has shown that it normally takes three to six months to obtain one's military records, particularly if the person is recently discharged.

After obtaining copies of one's records, the second step would be to complete DD Form 149, "Application For Correction of Military or Naval Records," along with supporting documents such as letters, brief of arguments, documentation, affidavits of witnesses, affidavits regarding character, etc. Instruction 7 on the reverse side of DD Form 149 reads that a "[p]ersonal appearance by you and your witnesses or representation by counsel is not required to insure full and impartial consideration of applications." This is directly contrary to experience and thus misleading to petitioners. The military does not assist in locating witnesses for an applicant, and because it is in the nature of the military to transfer people often, locating and getting affidavits from one's witnesses is acute, particularly if any length of time has passed since discharge. Finally, as to DD Form 149

and supporting documents, a petitioner receives no help from the military in completing the form. A few veterans' service organizations offer some help in this regard, but the availability of their assistance is not generally known, and the advice is by nonlawyers with overburdened case loads. Legal Aid Societies are by law prohibited from rendering legal assistance in regard to disputes with the military.

Once the DD Form 149 and supporting documents are completed, the petitioner mails them to Randolph Air Force Base, Texas. There the applications are reviewed by one of six examiners for the Air Force BCMR. The examiners review the application and have the authority to summarily deny relief, or, if in the examiner's judgment the appeal may be meritorious, the examiner prepares the case for review by the BCMR. The present work load of the examiners is over 400 applications per month, and no one seems to dispute the point that the number of examiners is not enough to adequately handle that many applications. If the examiner denies the application, the documents are returned to the petitioner, and the BCMR itself never sees that application. No reasons or findings are given by the examiner for denying an application. Approximately 90 percent of all cases are denied at this first stage.

Should a petitioner's application survive review by an examiner, the next step is referral of the case to the BCMR. The Air Force BCMR is composed of sixteen to eighteen members. All of the members are civilian employees of the Department of Defense who are engaged in full time duties in responsibilities other than their BCMR

membership. A meeting of three members on the Board constitute an executive session for purposes of a consideration or hearing.

A hearing before the Air Force BCMR is entirely discretionary with the Board, and hearings are generally denied. In calendar year 1974 there were approximately 4800 applications. Roughly ten percent or 480 of these files were referred to the BCMR by the examiners. Out of these 480 cases that received consideration by the Board only five or six actually received a hearing. Hearings were rarely granted because that gave the petitioner the right to have counsel present, and the Board is hostile to the presence of counsel in part because it drags out the time required to complete a hearing.

Should a petitioner be granted a hearing, in order for the hearing to be meaningful the applicant must be present along with her witnesses. However, the BCMR sits only in Washington, D.C. Thus an airman desiring a hearing is faced with the heavy and frequently insurmountable burden of travel and lodging expenses for her and her witnesses.[8] The home of the plaintiff herein is Richmond, California.

The BCMR lacks a formal discovery procedure and subpoena power.[9] Lack of discovery means the applicant has a difficult task of furnishing the Board a sufficient quantum of evidence indicating the existence of material error or injustice in order to be granted a hearing. Lack of subpoena power means the applicant has an almost impossible task of marshalling witnesses to prove her case at the hearing. The witnesses are likely military personnel, who are subject to being transferred all over the world.

8. *See* Haessig, *The Soldier's Right To Administrative Due Process: The Right To Be Heard*, 63 Mil.L.Rev. 1, 18 n. 93 (1974). *See also, Jeffries v. Olesen*, 121 F.Supp. 463 (S.D.Cal.1954), where the court held that the Post Office Department denied due process by holding a hearing in Washington instead of Los Angeles. The court stated

that "[i]t is equally shocking to learn that an administrative tribunal has so disregarded the necessity and convenience of a party defendant in an administrative proceeding." *Id.* at 476.

9. *See* Glosser & Rosenberg, *supra* note 6, at 399–401.

When faced with a legal issue, the BCMR relies on the opinions of the Office of the Judge Advocates General. This advisory opinion by the JAG is not made available to the applicant, nor is the author of the opinion made available for cross-examination.[10]

When the BCMR denies a hearing and the requested relief, it does not furnish the applicant any findings or the basis for its decision.[11] AF Reg. 31–3, para. 8c (Oct. 21, 1970). Accordingly a reviewing court has no basis on which it can ascertain whether the Board acted arbitrarily or capriciously in denying the hearing and relief.

The recommendation of the BCMR goes to the Secretary of the Air Force. AF Reg. 31–3, para. 22; 32 C.F.R. § 865.13 (1974). It is rare for the Board's recommendation to be rejected by the Secretary.[12]

Although the Secretary of the Air Force has the authority to reinstate a former serviceman, as the plaintiff seeks herein, 10 U.S.C.A. § 1552(d), Air Force policy is that reinstatement is not generally granted except where the reason for the discharge is invalidated and the member has only a short service time until retirement.[13] No applicants have been reinstated in the Air Force for the last ten years.

Interlocutory relief is not available from the Board. The BCMR is a post-discharge review board. The discharge is not stayed pending determination, thus the status quo cannot be preserved even in the most patently meritorious cases. AF Reg. 31–3, para. 7; 32 C.F.R. § 865.6 (1974). Presumably any bar to reenlistment would be removed in the event the BCMR corrects a serviceman's military records. The Board can make

awards of back pay, allowances, and other compensation. 10 U.S.C.A. § 1552(c), (d). However, mitigation of damages must be taken into consideration. AF Reg. 31–3, para. 26a; 32 C.F.R. § 865.-16(c) (1974). The backpay and other allowances can be awarded only up to a period of one year after the correction of records. 10 U.S.C.A. § 1552(d).

As of 1974 the average length of time from when an applicant first requests her military records until she receives consideration by the BCMR is one to two years. In the event some relief is granted the applicant, there is then an additional delay until numerous documents can be completed effecting the changes in one's military records and authorizing payment of a monetary award.

In light of the above description of the Air Force BCMR it can be said with conviction that: (1) for Airman Rew to seek relief by pursuing her administrative remedy would not only be expensive and time consuming but also totally useless; and (2) the only "policy" to be served by compelling Airman Rew to first present her claims to the BCMR would be to so discourage a past serviceman from trying to seek relief from a governmental bureaucracy that the serviceman eventually capitulates and relinquishes her claims in frustration, thus relieving the Air Force of the responsibility of dealing with the claims. The men and women of our nation's Air Force deserve better treatment in return for their service.

This court shares along with others the traditional judicial reluctance to interfere with the military establishment. However, this rule too has its limits as the court-martial[14] and selective service[15] cases well attest. The inter-

---

10. *See* Glosser & Rosenberg, *supra* note 6, at 401; Lunding, *supra* note 6, at 70–71.

11. *See* Glosser & Rosenberg, *supra* note 6, at 400, 402.

12. *See* Lunding, *supra* note 6, at 42 n. 61.

13. *See* Lunding, *supra* note 6, at 41 n. 57.

14. *See, e. g., Burns v. Wilson,* 346 U.S. 137, 73 S.Ct. 1045, 97 L.Ed. 1508 (1953).

15. *See, e. g., Oestereich v. Selective Service Bd.,* 393 U.S. 233, 89 S.Ct. 414, 21 L.Ed.2d 402 (1968). *See also, Hall v. Fry,* 509 F.2d 1105 (10th Cir. 1975), concerning involuntary activation of a national guard member into the Army.

ference is minimized here because the litigation is postdischarge.

Defendants argue that the failure to require exhaustion will "open up the flood gates to the filing of a new rash of cases in federal courts." This is of course a makeweight argument that is utilized to bolster the position of the Air Force already arrived at for other reasons. But even assuming this decision will increase federal filings, at least until the military and Congress can respond with the creation of a more viable administrative remedy, our federal courts cannot shirk from their constitutional and equitable duties merely to retain a more manageable caseload.

### III.

The regulation under which Airman Rew was discharged, AFM 39–10, para. 3–8 1 was first promulgated in March 1974. Its substantive provisions provide in relevant part as follows:

1. Minimally Productive Limited Potential Airmen:

(1) General. Certain airmen who apparently have met Air Force enlistment criteria may, during initial periods of basic or technical training, fail to meet minimum standards for retention in the Air Force in that they may be unable to adjust to the demands of military life, lack requisite aptitudes for satisfactory service, or reveal nonmedical disqualifying conditions. Other airmen may be able to complete initial training requirements only to encounter unexpected difficulty with duty performance, on the job training, or self discipline. Their abilities, personalities, or attitudes may preclude more than minimal productivity and indicate limited potential for continued military service. Such members who fail to progress at a normal rate or fail to meet acceptable standards of conduct and/or duty performance should be separated. In determining whether separation is appropriate commanders and discharge authorities will carefully evaluate the member's potential and insure that reasonable efforts have been made to provide any assistance or guidance which might enable the airman to achieve a productive capacity. Members should not be discharged under this provision when other administrative or disciplinary action is clearly more appropriate. Airmen discharged under this provision will receive honorable discharge certificates.

(2) Criteria. Discharge under this provision is appropriate when an airman:

(a) Demonstrates limited potential for normal career progression as manifested by duty performance or behavior.

(b) Gives no indication of becoming an acceptable airman within a reasonable time.

The regulation was issued pursuant to the authority set forth in 10 U.S.C.A. §§ 1169, 8012. The plaintiff maintains that her discharge under AFM 39–10, para. 3–8 1, without a hearing at which she would have the assistance of counsel and be able to call witnesses on her behalf and cross-examine the witnesses against her denies her liberty and property without due process contrary to the fifth amendment. Defendants deny that the plaintiff has any property interests in continued service in the Air Force and maintain that the nature of the discharge does not violate any of her liberty interests.

In ascertaining what are protected property interests the Court in *Board of Regents v. Roth*, 408 U.S. 564, 571, 92 S.Ct. 2701, 2706, 33 L.Ed.2d 548 (1972), first instructed us to "look not to the 'weight' but to the *nature* of the interest at stake." It then defined the nature or attributes of property interests as follows:

To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it.

He must, instead, have a legitimate claim of entitlement to it. It is a purpose of the ancient institution of property to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined. It is a purpose of the constitutional right to a hearing to provide an opportunity for a person to vindicate those claims.

Property interests, of course, are not created by the Constitution.

Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law —rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.

*Id.* at 577, 92 S.Ct. at 2709.

▉ Airman Rew's enlistment agreement, AF Form 1114,[16] and oath of

16. The plaintiff's enlistment agreement provides as follows:

AGREEMENT

. . .

C. I am enlisting in the United States Air Force to serve on active duty for 6 years.
(enter number)

D. The Air Force guarantees that my initial job will be in AF Specialty Code (AFSC)   64530  , the title of which is Inventory Management Specialist.
  (enter number)                                    (enter title)
I understand and agree that if through no fault of my own I am later found *disqualified for* entrance into training for this job, I may elect to complete my enlistment in another job for which qualified or be immediately discharged.

. . .

G. The Air Force has authorized, and I accept, enlistment in the grade of E–1. I have no claim to any higher grade.

H. I understand that the Air Force guarantees me the opportunity to learn another job after I complete at least 18 months' duty at the semi-skilled level or above, i. e., 3 level or higher, in my initial specialty provided: (1) I apply for the retraining in accordance with appropriate Air Force directives; (2) I am not pending reassignment at the time I apply, specifically, notification of a new assignment has not been received nor have orders been published; (3) There is a projected shortage of airmen reenlisting in the desired specialty at the time I will have completed four years on active duty; (4) I meet all requirements for entry into the desired specialty; and (5) I agree to extend my enlistment or reenlist as required by existing Air Force Policy. I also understand that I may be required to involuntarily retrain into another skill during my enlistment if Air Force requirements change.

. . .

J. In consideration of my agreement to enlist for a period of six years in the
                                (write out terms of agreement)
Air Force, I understand that I will be promoted to the grade of E–S when I finish basic military training unless through my own misconduct, I render myself ineligible for such promotion.

. . .

K. This form (and its attachments) list all promises made to me with regard to job, enlistment grades, future promotions, assignment locations, leave schedules, training schools, etc., except: (Applicant must write out other agreements, if any, and recruiter or AFEES Liaison NCO countersign.)

enlistment in her enlistment contract,[17] DD Form 4, agreed to and signed by Airman Rew before she was accepted into the Air Force, clearly negate any claim to a protected property interest to retention in the Air Force. That AFM 39–10, para. 3–8 l, was promulgated subsequent to plaintiff's enlistment does not change this result for she has no vested right to discharge pursuant only to regulations in effect on the day of her enlistment.

■ The next question is whether the nature and circumstances of Airman Rew's administrative discharge abridged protected liberty interests. Liberty interests are implicated where summary governmental action is taken which (1) seriously damages one's associations and reputation in their community or (2) imposes a stigma which hinders one's ability to secure other employment in their chosen field.

In *Cafeteria Workers v. McElroy*, 367 U.S. 886, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961), it was held that a summary exclusion of a cook from the premises of a factory engaged in classified defense work for the Navy, without a hearing and without advice as to the specific grounds for her exclusion, did not violate the due process clause. The Court was careful to note, however, that "this is not a case where government action has operated to bestow a badge of disloyalty or infamy, with an attendant foreclosure from other employment opportunity." *Id.* at 898, 81 S.Ct. at 1750.

The cook was excluded only from employment at the factory and not from other federal or private employment. *Id.* at 898–99, 81 S.Ct. 1743.

In striking down a state statute permitting posting of the name of an alcoholic in retail liquor outlets, without notice and an opportunity to be heard, prohibiting sales to the individual, the Court in *Wisconsin v. Constantineau*, 400 U.S. 433, 437, 91 S.Ct. 507, 510, 27 L.Ed.2d 515 (1971), said that "[w]here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential." *Board of Regents v. Roth, supra*, 408 U.S. at 573–74, 92 S.Ct. at 2707, further delineated the two circumstances when liberty interests may be implicated:

> The State, in declining to rehire respondent, did not make any charge against him that might seriously damage his standing and associations in his community. It did not base the nonrenewal of his contract on a charge, for example, that he had been guilty of dishonesty, or immorality. Had it done so, this would be a different case.

> . . . . . .

> Similarly, there is no suggestion that the State, in declining to re-employ the respondent, imposed on him a stigma or other disability that foreclosed his freedom to take advantage of other employment opportunities. The

---

17. Plaintiff's oath of enlistment provides as follows:

I,_____DORIS ANN REW_____, do hereby acknowledge to have volun-
    (First Name-Middle Name-Last Name)
tarily enlisted under the conditions prescribed by law, this 8th day of JUN, 1973, in the UNITED STATES AIR FORCE for a period of SIX (6) years unless sooner discharged by proper authority; and I do solemnly swear (or affirm) that I will support and defend the Constitution of the United States against all enemies, foreign and domestic; that I will bear true faith and allegiance to the same; and that I will obey the orders of the President of the United States and the orders of the officers appointed over me, according to regulations, and the Uniform Code of Military Justice. So help me God.

State, for example, did not invoke any regulations to bar the respondent from all other public employment in state universities. Had it done so, this, again, would be a different case. For "[t]o be deprived not only of present government employment but of future opportunity for it certainly is no small injury . . . . " *Joint Anti-Fascist Refugee Committee v. McGrath*, [341 U.S. 123] at 185 [71 S.Ct. 624, 95 L.Ed. 817] (Jackson, J., concurring).

More recently it was said as to the suspension of high school students based on charges of misconduct, "[i]f sustained and recorded, these charges could seriously damage the students' standing with their fellow pupils and their teachers as well as interfere with later opportunities for higher education and employment." *Goss v. Lopez*, 419 U.S. 565, 575, 95 S.Ct. 729, 736, 42 L.Ed.2d 725 (1975) (footnote omitted). "[L]iberty is not offended by dismissal from employment itself, but instead by dismissal based upon an unsupported charge which could wrongfully injure the reputation of an employee." *Arnett v. Kennedy*, 416 U.S. 134, 157, 94 S.Ct. 1633, 1646, 40 L.Ed.2d 15 (1974).

■ The nature of Airman Rew's involuntary administrative discharge was not so as to seriously damage her association and reputation in the community rising to a protected liberty interest. Her discharge was initiated and later renewed and completed for reasons that at most reflect that she resented being in submission to some of her superiors and that she was shirking at least some of her duties.[18] Thus she was deemed to be a minimally productive limited potential airman. Moreover, she was issued an honorable discharge certificate, DD Form 256AF. The reasons for her

discharge are not comparable to charges of criminal conduct, dishonesty, or immorality, *Board of Regents v. Roth*, *supra*, or to being publicly branded as an alcoholic, *Wisconsin v. Constantineau*, *supra*.

Whether the nature of the discharge is such as to impose a stigma or other disability that forecloses Airman Rew's freedom to take advantage of other employment opportunities is a closer question. In the first place a discharge under AFM 39–10 is a bar to reenlistment in all branches of the armed forces. More importantly, however, it could impair civilian employment with the federal government and in the private sector. At the time of discharge eight copies of the Report of Separation from Active Duty, DD Form 214, is prepared. As directed by AF Reg. 35–6 (July 3, 1974, as amended), the authority and reason for the discharge, the separation program designator [SPD], and the reenlistment code are not entered on the copy of DD Form 214 provided Airman Rew, the Veterans Administration, and the Selective Service. The other five copies have this information. In the event the plaintiff should apply for employment with the federal government, an unexpurgated copy of the DD Form 214 is available to the Civil Service Commission upon request. This is no small disability when one considers that the federal government is the largest employer in the nation.

The DD Form 214 is the document normally asked for by employers in the private sector. Although the form given to the separatee no longer has the reason for discharge and SPD code number, many employers are aware that a narrative summary delineating the reason for separation and reenlistment eligibility is

---

18. The reasons for her discharge are set out in note 1, *supra*. The alleged possession and use of an illegal drug was not one of the reasons for her discharge but rather one of the reasons for revoking her probationary

period. *See* text accompanying note 2, *supra*. The result herein may possibly be different where a reason for discharge is alleged criminal conduct.

available upon request to the separatee. AF Reg. 35–6, para. 4–4 (Sept. 16, 1974).[19] When an employer knows someone has been in the service, they will either ask the separatee to furnish a copy of the narrative summary or have her sign a routine waiver allowing the company to get the summary.[20] The argument by the Air Force that liberty interests are not implicated because the type of discharge is honorable is a misplaced reliance on the cosmetic appearance of the discharge certificate and ignores what employers do in practice in order to screen job applicants. Moreover, the copy of the DD Form 214 furnished the separatee does reflect the period of service. Most employers are aware of what normal enlistment periods are in the services. Thus, any time something differs from the norm an employer is usually going to want to know why. Airman Rew's DD Form 214 reflects a period of service of only approximately 19 months.

On the authority of *Goss v. Lopez, supra, Board of Regents v. Roth, supra,* and *Cafeteria Workers v. McElroy, supra,* the court concludes that because of the likelihood of governmental communication of derogatory information to possible future employers Airman Rew has a protected liberty interest.[21]

## IV.

"Once it is determined that due process applies, the question remains what process is due." *Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972). What has not been considered up until this point and is of vital importance insofar as what process is due is that the Air Force is "a specialized society separate from the civilian society—with laws and traditions of its own [developed] during its long history." *Parker v. Levy,* 417 U.S. 733, 743, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974). Furthermore, "it is the primary business of [our armed forces] to

19. The Air Force form letter attached to AF Reg. 35–6 utilized for furnishing a separatee the narrative summary is as follows:

REPLY TO (office address symbol)  (date)
ATTN OF:
SUBJECT: Narrative Reason for Separation/Retirement
    TO: (member's name and SSAN)
  1. Your DD Form 214 for the period of service from (date) to (date), reflects that your separation/retirement was for (show narrative reason for separation) (see note 1).
  2. Your reenlistment eligibility for the above period of service is _____
  3. Your separation/retirement is under the provisions of ____ (see note 2)

FOR THE COMMANDER
  *   *   *   *   *   *
  *   *   *   *   *   *
NOTES: 1. Narrative reason for separation/retirement will be furnished without reference to the member's SPD. (For example, early release to attend school; First-Term Airmen Early Release Program FY75, involuntary discharge, character and behavior disorder.
2. Show directive number only, do not show reference to a specific paragraph or subparagraph.

20. The information contained in the narrative summary cannot be released to anyone other than the separatee without her written permission. 5 U.S.C.A. § 552(b); AF Reg. 35–6, para. 4–4 (Sept. 16, 1974).

21. The court disagrees with the conclusion in *Sims v. Fox,* 505 F.2d 857, 863 (5th Cir. 1974), *rev'g.* 492 F.2d 1088 (5 Cir. 1974), that the infringement of liberty interests is not a substantial possibility in this type of case.

fight or be ready to fight wars should the occasion arise," *Toth v. Quarles,* 350 U.S. 11, 17, 76 ·S.Ct. 1, 100 L.Ed. 8 (1955). "To prepare for and perform its vital role, the military must insist upon a respect for duty and a discipline without counterpart in civilian life. The laws and traditions governing that discipline have a long history; but they are founded on unique military exigencies as powerful now as in the past." *Schlesinger v. Councilman,* 420 U.S. 738, 95 S. Ct. 1300, 1313, 43 L.Ed.2d 591 (1975). Moreover, it is well known that many of those enlisting in the armed forces are young people having recently completed their formal education. In a time when the home and church play a diminishing role in shaping the character and value judgments of the ·young, a heavier burden falls on the services to instill in each serviceman the necessity of rules and obedience thereto. *See Goss v. Lopez, supra,* 419 U.S. at 592–94, 95 S.Ct. 729 (Powell, J., dissenting). Thus, the judiciary must be careful not to unduly hamstring the military's interest in the expeditious separation of personnel incapable or unwilling to meet minimum standards.

Because of these competing interests, the court finds that Airman Rew received the procedural safeguards that were due considering the circumstances and nature of the discharge. AFM 39–10, para. 3–8 l(3), provides for the following process upon initiation of discharge:

(3) Procedures. If the immediate commander believes that discharge under this provision is appropriate, he will take the following actions:

(a) Prepare a letter to the commander exercising special court-martial authority including:

1. The specific reason(s) for recommending discharge with a resume of the events or description of conditions resulting in the action.

2. Statements of corrective/remedial actions and the extent of their effectiveness.

3. The following information from the military record:

a. Date of birth, date and term of enlistment, all test scores, records of disciplinary action under the UCMJ, including specific offenses and punishment imposed, and any other date meriting consideration.

b. For airmen who have not completed initial training attach training records, statements from˙ instructors or signed records of counseling about deficiencies.

c. For other airmen include performance reports, favorable or derogatory communications, citations or awards, and date assigned to present organization.

(b) Notify the member of the proposed discharge by letter containing all the information required in the sample format, attachment 1. Require acknowledgment according to attachment 2.

. . .

(d) Forward the case with the airman's acknowledgment and any comment submitted by the member to the commander exercising special court-martial authority who may either approve or disapprove the recommended discharge.

(e) Notify the member of the final decision. If discharge is approved, and honorable discharge certificate will be furnished and it will be executed promptly.

Attachments 1 and 2 referred to in subparagraph (3)(b) above are set forth in

the margin.[22] As is evident from the regulation and attachments, anyone being discharged under AFM 39–10, para. 3–8 l, receives written notice that an administrative discharge is being initiated, a detailed factual statement of the basis for the proposed discharge including dates and names of witnesses against them, an opportunity to respond to the charges in writing, the free as-

22. Attachment 1
   (SAMPLE—DISCHARGE OF MINIMALLY PRODUCTIVE/LIMITED POTENTIAL AIRMAN

REPLY TO
ATTN OF: (office address symbol)
SUBJECT: Letter of Notification
   TO: (airman)

1. Under the provisions of AFM 39–10, chapter 3, paragraph 3–8 l, dated _____, I am initiating action to discharge you from the Air Force. If my recommendation is approved, you will receive an honorable discharge certificate.

2. The reasons for my proposed action are: (state specific, factual details which constitute the basis for the determination that the airman is unable to progress satisfactorily, or adjust to the demands of military life, or meet the standards of duty performance and self-discipline required of satisfactory airmen. Include dates of incidents and names of witnesses in order that the airman may have the information needed to reply.)

3. If you wish to be retained in the Air Force, you may submit statements in support of your desire and they will be considered by the discharge authority along with my recommendation for your elimination. If requested, military legal counsel will be made available to assist you in preparation of your comments. My recommendation with your reply will be submitted to the Commander, (cite unit designation of special court-martial authority), who will make the final decision in your case.

5. Execute the attached acknowledgment and return it within 24 hours. Any comment you desire to submit requesting retention must reach me within 3 days after you receive this letter, unless you request and receive an extension for good cause shown.

6. A copy of AFM 39–10 is attached for your use.

| (commander's signature) | 2 Atch |
| (typed name, grade, USAF) | 1.Acknowledgment |
| | 2.AFM 39–10 |

Attachment 2

(SAMPLE—AIRMAN'S ACKNOWLEDGMENT)

SUBJECT: Receipt of Notification (Your letter dtd _____ (date))

TO: (immediate commander)

1. Letter of notification of action under the provisions of AFM 39–10, Chapter 3, paragraph 3–8 l, dated _____, was received at (hours) on     (date)    .

2. I (do) (do not) request retention in the Air Force. I understand that military legal counsel will be available to assist me upon request. I (do) (do not) desire that military legal counsel be appointed to assist me.

3. I (will) (will not) submit statements in support of my request for retention.*

(airman's signature)
(typed name, grade, SSAN, USAF)
(organization)

* Strike through as not applicable and initial when retention is requested.

sistance of counsel to help in the preparation of an airman's written response to the charges, and a copy of the Air Force regulation under which the discharge action is proceeding.

Airman Rew availed herself of the procedures afforded under para. 3–8 l, particularly obtaining the assistance of counsel to prepare a written response to the charges against her. Moreover, as proof that the procedure is more than just a formality, Airman Rew's defense was successful in obtaining a 90 day probationary period during which the discharge action was held in abeyance and Airman Rew was given the chance to demonstrate a change in attitude.

That the hearing afforded under para. 3–8 l is not an adversary proceeding at which Airman Rew had the right to confront her accusers and cross-examine them does not mean the procedure falls short of due process. "[T]he timing and content of the notice and the nature of the hearing will depend on appropriate accommodation of the competing interests involved." *Goss v. Lopez, supra,* 419 U.S. at 579, 95 S.Ct. at 738. "[T]he very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation." *Cafeteria Workers v. McElroy, supra,* 367 U.S. at 895, 81 S.Ct. at 1748. We do well to remember it is a Constitution that is being construed. Courts are slow to declare new constitutional requirements because once declared the law takes on a rigidity from which it is difficult to retreat when unexpected and changing circumstances call for flexibility. In times of relative peace the Air Force could reasonably be expected to respond to the demands of servicemen such as Airman Rew for a fuller panoply of due process rights. Such would not be reasonable when the Air Force is called on to fight a war. This is not to say that a serviceman's interests in further procedural rights in the involuntary separation situation are to be brushed aside in all cases. At least on the present record, however, it cannot be said that the competing interests are best effectuated by compelling the Air Force to afford Airman Rew any further due process as a matter of constitutional right.[23]

### V.

In summary, the court finds (1) that to require plaintiff to exhaust her administrative remedies would be a futile act, (2) that the plaintiff does have a protected liberty interest in continued service in the Air Force, and (3) the plaintiff received the procedural safeguards that were due under the circumstances. Judgment will be entered for the defendants.

---

23. The court would expect that in many cases the Air Force will fairly treat their airmen because it is in its own self interest to do so. Considerations of the maintenance of high morale as well as wise management of personnel which the Air Force has invested time and money in training dictate against the use of the administrative discharge in an arbitrary and capricious manner.