Stephen J. CUSHING

v.

Commander J. E. TETTER, Director of Administration, Naval Education and Training Center, Newport, Rhode Island; Captain E. C. Whelan, Commanding Officer, Naval Education and Training Center, Newport, Rhode Island; Thomas A. Hayward, Chief of Naval Operations, Department of the Navy; W. Graham Claytor, Jr., Secretary of the Navy.

Civ. A. No. 79–226.

United States District Court, D. Rhode Island.

July 2, 1979.

Robert B. Mann, Providence, R. I., for plaintiff.

Everett Sammartino, Asst. U. S. Atty., Providence, R. I., for defendants.

## OPINION

PETTINE, Chief Judge.

This case involves a challenge by the plaintiff, an enlisted man in the United States Navy with the rank of Airman who is currently assigned to the disciplinary barracks at the Naval Education and Training Center, Newport, Rhode Island, to effectuation of orders sending him to his former military unit, VA 192, an attack squadron currently attached to the USS America CV 66 in the Mediterranean area. Plaintiff alleges that effectuation of these orders will violate his rights under the eighth amendment, the fifth amendment, and the sixth amendment. Plaintiff seeks an injunction prohibiting the defendants from transferring him to his former unit and a declaration that his constitutional rights have been violated. He does not seek to prevent the defendants from sending him to any other post. The case is now before the Court on a stipulated record, and both parties have submitted memoranda of law setting forth their respective legal positions. The Court has jurisdiction under 28 U.S.C. § 1331.

Plaintiff enlisted in the United States Navy for four years in 1975, and normally would be discharged on August 3, 1979. Since June 1976, he has been a member of VA 192. In early March, 1979, he departed that command, then in California, on the day it left to join the USS America CV 66 in the Mediterranean area. His absence was unauthorized. On March 27, he was admitted to the psychiatric ward of the Beth Israel Hospital in Boston, Massachusetts, where he remained as an in-patient until April 12. Shortly after his admission, hospital authorities notified the Naval Investigative Service of the fact of his admittance.

While in the hospital, plaintiff was examined by several doctors and underwent psychological testing. According to a letter dated April 11, signed by two of these physicians, Dr. Stephen Schoonover and Dr. Lisa Shulman, when he was admitted he was suffering from an "acute depressive reaction in the midst of a situational crisis." Because of the plaintiff's suicidal ideation, he was kept in the hospital to evaluate the suicide risk; ultimately, the doctors concluded he "did not remain acutely suicidal in the sheltered hospital setting, nor was he psychotic, but he was felt to be seriously emotionally disturbed and significantly depressed." The doctors felt that this condition was triggered by "a combination of reality stresses and perceptual distortions

about his relationship with his current commanding officer," and that "the likelihood is high that a return to the same situation would cause this breakdown of defenses to recur." Reports from the testing indicated the plaintiff was a "significant risk for suicidal and homicidal acts if he does not receive adequate treatment." The final diagnosis was of a need for ongoing psychiatric treatment, preferably in a civilian setting; most significantly for this case, the doctors concluded that there was "a high likelihood that a return to his unit with a re-creation of the situation leading to the patient's inability to cope with long-standing conflicts would lead to the recurrence of the homicidal or suicidal state."

On April 18, after his release from the hospital, plaintiff went to the Naval Education and Training Center in Newport, R.I., and presented himself to the discipline officer. This officer was provided a copy of the medical report discussed above.

On or about April 20, the plaintiff was interviewed by Dr. J. C. Mangrum, a Navy psychiatrist. At the start of this interview, the plaintiff was warned that anything he said could be used against him in a judicial proceeding. This warning was significant because plaintiff knew he might be facing court martial charges arising out of his unauthorized absence and an alleged assault prior to his absence. The interview lasted no more than about an hour. Prior to this interview, plaintiff was interviewed for about ten minutes as to certain background material by an assistant of Dr. Mangrum. Subsequent to this interview, plaintiff has had only one contact with a Navy psychiatrist, a second meeting with Dr. Mangrum which lasted only 10–15 minutes because plaintiff declined to proceed when again learning anything he said could be used against him. Dr. Mangrum's report reflects the limited nature of these interviews due to this lack of confidentiality; Dr. Mangrum was unable to discuss with the plaintiff the source of the plaintiff's distress, especially the impetus for going AWOL and the plaintiff's reasons for feeling he must not return to his former command. Based on this rather limited examination, Dr. Mang-

rum concluded that the plaintiff suffered from an "Adjustment Reaction of Adult Life, 307.3, with attitudinal despair." He recommended that plaintiff was psychiatrically fit for full duty and found him responsible and accountable for his actions. Although he noted the existence of the April 11 letter from Drs. Schoonover and Shulman, at no point in his report does he indicate why he rejected their conclusions, or indeed that he even considered this evidence in reaching his own conclusion that the plaintiff was fit for duty.

On April 27, plaintiff was informed of Dr. Mangrum's conclusion that he was fit for duty and also told that he would receive orders as early as May 1 to return to his former military unit. On April 30, plaintiff commenced this action; by agreement of the parties, a temporary restraining order was issued enjoining transfer of the plaintiff from his present unit, the Disciplinary Barracks at the Naval Education and Training Center in Newport. By agreement of the parties, this order was continued in full force and effect until ten days following submission of briefs by the parties.

During this period, the plaintiff continued to undergo treatment as an outpatient by Dr. Shulman. According to a letter signed by her dated June 1, these subsequent contacts have confirmed her initial assessment of the plaintiff "as someone with a severe emotional disturbance." She describes him as suffering "transient losses of control" and states that were he sent back to his squadron it would be "at very great risk for a total breakdown of his ego defenses, leading to suicide or serious harm of others." Further testing has confirmed her assessment of the plaintiff as someone "with a tenuous control over deeply rooted conflicts." She is committed to treating the plaintiff as long as necessary, which is expected to be several years.

On June 22, ten days after submission of the defendant's brief, the Court issued a preliminary injunction prohibiting transfer of the plaintiff to his former unit, but not preventing his transfer to any other post or

the institution of court martial proceedings against him. The Court also ordered the plaintiff to pursue immediately any administrative remedies. Due to the need to issue the injunction before expiration of the temporary restraining order, the Court deferred full discussion of the bases for its factual and legal conclusions. This opinion constitutes that discussion.

The plaintiff seeks an injunction preventing him from being returned to his squadron. He argues that, in light of his psychiatric condition, his return would deprive him, without due process of law, of his constitutional right to life and liberty; would constitute cruel and unusual punishment in violation of the eighth amendment; and deprive him of his constitutional and statutory right to medical care. Additionally, he argues that if he is returned to his unit he will be deprived of his sixth amendment rights to counsel and to compulsory process for obtaining witnesses in his favor when he faces charges arising out of his absence and also an alleged assault incident which apparently occurred before his absence.

The defendants respond that this Court does not have jurisdiction to entertain plaintiff's claims and should defer all hearings to the military. On this basis, they have filed a motion to dismiss. Primarily, they rely on cases which hold that ordinarily civilian courts have no authority to interfere with the military relative to duty assignments, *see, e. g., Orloff v. Willoughby,* 345 U.S. 83, 73 S.Ct. 534, 97 L.Ed. 842 (1953), and that civilian courts should not interfere with ongoing court martial proceedings even when constitutional claims, not related to the right of the military to try the individual at all, are involved. *See, e. g., Schlesinger v. Councilman,* 420 U.S. 738, 95 S.Ct. 1300, 43 L.Ed.2d 591 (1975).

█ It is true that the traditional view was that military administrative determinations are not reviewable by civilian courts. This viewpoint, typified in the oft-cited case of *Orloff v. Willoughby, supra,* regards the military as so different from civilian agencies that the courts should not interfere

with its decisions. This is true even when a deprivation of constitutional rights is alleged, so long as there is an internal remedy for the alleged deprivation, *Noyd v. Bond,* 395 U.S. 683, 89 S.Ct. 1876, 23 L.Ed.2d 631 (1969), or the military has given full consideration to the constitutional claim, *Burns v. Wilson,* 346 U.S. 137, 73 S.Ct. 1045, 97 L.Ed. 1508 (1953). However, recent cases have made clear that, at least outside the context of the court martial, some degree of judicial review is available for constitutional challenges to military actions. *See, e. g., Dunlap v. State of Tennessee,* 514 F.2d 130 (6th Cir. 1975), *rev'd on other grounds,* 426 U.S. 312, 96 S.Ct. 2099, 48 L.Ed.2d 660 (1976); *Friedman v. Froehlke,* 470 F.2d 1351 (1st Cir. 1972); *Mindes v. Seaman,* 453 F.2d 197 (5th Cir. 1971). This position has been supported by commentators as well. *See* Haggerty, *Judicial Review of Military Administrative Decisions,* 3 Hastings Const. L.Q. 171 (1976); Comment, *Free Speech and the Armed Forces: The Case Against Judicial Deference,* 53 N.Y.U.L.Rev. 1102 (1978).

The decision in *Mindes v. Seaman, supra,* set forth the principles to be applied in determining whether a particular military decision is reviewable, and outlined the factors which a judge should weigh in deciding whether the Court should review, once it is decided that review is available. The court reviewed numerous cases both granting and denying review and held:

> From this broad ranging, but certainly not exhaustive, view of the case law, we have distilled the primary conclusion that a court should not review internal military affairs in the absence of (a) an allegation of the deprivation of a constitutional right, or an allegation that the military has acted in violation of applicable statutes or its own regulations, and (b) exhaustion of available intraservice corrective measures. The second conclusion, and the more difficult to articulate, is that not all such allegations are reviewable.

A district court faced with a sufficient allegation must examine the substance of that allegation in light of the policy rea-

sons behind nonreview of military matters. In making that examination, such of the following factors as are present must be weighed (although not necessarily in the order listed).

1. The nature and strength of the plaintiff's challenge to the military determination. Constitutional claims, normally more important than those having only a statutory or regulatory base, are themselves unequal in the whole scale of values—compare haircut regulation questions to those arising in court-martial situations which raise issues of personal liberty. An obviously tenuous claim of any sort must be weighted in favor of declining review. [citation omitted]

2. The potential injury to the plaintiff if review is refused.

3. The type and degree of anticipated interference with the military function. Interference per se is insufficient since there will always be some interference when review is granted, but if the interference would be such as to seriously impede the military in the performance of vital duties, it militates strongly against relief.

4. The extent to which the exercise of military expertise or discretion is involved. Courts should defer to the superior knowledge and experience of professionals in matters such as promotions or orders directly related to specific military functions. We do not intimate how these factors should be balanced in the case sub judice. That is the trial court's function. 453 F.2d at 201–02.

This approach was cited with approval by the First Circuit in *Pauls v. Secretary of the Air Force*, 457 F.2d 294 (1st Cir. 1972). Consequently, the Court concludes that it should apply the *Mindes* criteria to determine whether to review this case.

Initially, it is clear that the plaintiff has alleged the deprivation of a constitutional right. His complaint claims a denial of rights guaranteed by the fifth, sixth, and eighth amendments. On the other hand, the question of exhaustion is not so clear. The defendants have suggested that Article 138 of the Uniform Code of Military Justice, 10 U.S.C. § 938, grants the plaintiff a method whereby he may challenge the decision that he is fit for duty and should be returned to his former unit.[1] Plaintiff, while apparently conceding that Article 138 supplies a remedy, argues that the time between when he learned of the Navy's decision and the expected implementation of that decision was such that in this case resort to the remedy would have been to no avail. He also suggests that Article 138 has no provision for interlocutory relief.

■ The Court agrees that on the facts of this case plaintiff was justified in failing to resort to the administrative remedy prior to seeking relief here. *Mindes* only requires exhaustion of available remedies; to be truly available, a remedy must not only exist, but also be sufficient to prevent irreparable harm. Plaintiff was informed on Friday, April 27, that Dr. Mangrum had found him fit for duty and that he would receive orders sending him back to his former unit as soon as Tuesday, May 1. This time span of four days, including two weekend days, was unlikely to be enough to obtain administrative relief. Furthermore, it is unclear whether interlocutory relief is available under Article 138. The statute does state that the "officer exercising general court-martial jurisdiction shall examine into the complaint and take proper measures for redressing the wrong complained of." The Court is of the opinion that this would authorize that officer to stay a transfer order in case such as this. However, this

1. 10 U.S.C. § 938 provides:
 Any member of the armed forces who believes himself wronged by his commanding officer, and who, upon due application to that commanding officer, is refused redress, may complain to any superior commissioned officer, who shall forward the complaint to the officer exercising general court-martial jurisdiction over the officer against whom it is made. The officer exercising general court-martial jurisdiction shall examine into the complaint and take proper measures for redressing the wrong complained of; and he shall, as soon as possible, send to the Secretary concerned a true statement of that complaint, with the proceedings had thereon.

interpretation is by no means the only one possible, and the Court is not aware of any decisions interpreting this provision. Consequently, at the time this action was initiated, it was reasonable for the plaintiff at least temporarily to forgo this remedy and seek aid from this Court. In any event, under the present posture of the case, it clearly would be impossible for the plaintiff to exhaust his administrative remedies before being returned to his unit; if the Court declined to act, he would face immediate transfer. Finally, notwithstanding the holding in *Mindes* that administrative remedies should be exhausted, several courts have held that resort to the administrative remedy is not required when to do so would be fruitless. *See, e. g., Suro v. Padilla*, 441 F.Supp. 14 (D.P.R.1976); *Vance v. United States*, 434 F.Supp. 826 (N.D.Tex.) *aff'd*, 565 F.2d 1214 (5th Cir. 1977); *Rew v. Ward*, 402 F.Supp. 331 (D.N.M.1975). *See also* Haggerty, *supra*, at 177. Especially noteworthy in this regard is *Suro v. Padilla*, *supra*, where the Court issued a preliminary injunction pending the outcome of administrative remedies; the Court noted that the particular administrative remedy therein available did not provide for interlocutory relief and that irreparable harm would result pending exhaustion of the remedy. Therefore, the Court concludes that the plaintiff need not have pursued his claim by invocation of Article 138 Proceedings prior to initiating this action.

The presence of an allegation of the deprivation of a constitutional right, and of the lack of administrative remedies which are both available and realistic, suggests that the Court can review this case. The remaining *Mindes* factors are addressed more to whether a court will review, notwithstanding its power to do so. These factors essentially comprise a "judicial policy akin to comity" which seeks to avoid interference with the military "in the performance of its vital mission" and also to avoid second guessing judgments which lie within the military's discretion. *Mindes, supra*, 453 F.2d at 199. *See also* Haggerty, *supra*, at 178.

### The Nature and Strength of the Plaintiff's Challenge

■ The first of the factors to be balanced is perhaps the most significant. A constitutional claim is more likely to weigh in favor of review than statutory or regulatory claims; similarly, some constitutional claims are more significant than others. The apparent strength of the claim is equally important; the stronger the claim, the less the deference that should be given the military judgment. Essentially, consideration of this factor amounts to a determination of the extent to which the plaintiff has stated a probability of success.

In the present case, as already noted, the plaintiff raises claims under the fifth, sixth, and eighth amendments. The sixth amendment claim has little force, however. The plaintiff apparently faces charges arising out of both his unauthorized absence and his alleged involvement in an assault prior to his absence. He claims that if he is returned to his original unit, he will be deprived of his right to military counsel, his right to civilian counsel, and the right to compulsory process for obtaining witnesses in his favor, specifically the doctors who treated him at Beth Israel Hospital.

■ Despite the plaintiff's allegations, there is no evidence that the defendants intend to deny him these rights. Article 38 of the Uniform Code of Military Justice, 10 U.S.C. § 838, provides that the accused in a court-martial proceeding has the right to be represented by civilian counsel provided by him, by military counsel of his own choosing if reasonably available, or by defense counsel detailed to represent him. Similarly, under Article 46, 10 U.S.C. § 846, the accused has the same right to compel a witness to appear as a defendant in a civilian criminal trial. There is no reason to believe that the defendants will not grant the plaintiff these rights, nor is there reason to believe that if an attempt is made to deny these rights, there will be no remedy within the military judicial system. As the United States Supreme Court has noted,

[I]mplicit in the congressional scheme embodied in the Code is the view that the military court system generally is adequate to and responsibly will perform its assigned task. We think this congressional judgment must be respected and that it must be assumed that the military court system will vindicate servicemen's constitutional rights.

Schlesinger v. Councilman, supra, 420 U.S. at 758, 95 S.Ct. at 1313.

To the extent the plaintiff alleges that his sixth amendment rights will be violated, application of this element of the *Mindes* test strongly suggests that the Court should not grant review.

■ For different reasons, plaintiff's eighth amendment claims also have little force. Plaintiff argues that, given the medical evidence in this case, a return to his former unit would represent the deliberate indifference to a serious medical need which the United States Supreme Court has held is proscribed by the eighth amendment. *See Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). He suggests that this standard, originally applied in the context of prison inmates deprived of medical care, should apply equally to members of the armed services in that both are dependent on the government for medical care. Whatever the merits of this comparison, however, it is clear that the eighth amendment has no application to the present case. As the United States Supreme Court held in *Ingraham v. Wright*, 430 U.S. 651, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977):

[T]he State does not acquire the power to punish with which the Eighth Amendment is concerned until after it has secured a formal adjudication of guilt in accordance with due process of law.

Where the State seeks to impose punishment without such an adjudication, the pertinent constitutional guarantee is the Due Process Clause . . . .

*Id.* at 671 n. 40, 97 S.Ct. at 1413.

Consequently, the plaintiff's claim that the defendants are unconstitutionally depriving him of medical care is cognizable, if at all, only through the due process clause of the fifth amendment.[2]

■ Plaintiff's fifth amendment claim, however, is quite strong. In the most literal sense, he claims that a return to his former unit would deprive him of life and liberty without due process. The April 11 and June 1 medical evaluations indicate that return of the plaintiff to his unit would create a risk of suicide and/or homicide. If as a result of his return, plaintiff kills himself, then he quite obviously will suffer from a loss of life. Similarly, if he kills or seriously injures someone else, he will face a loss of liberty. In addition to this literal interpretation of the fifth amendment, the plaintiff's claim that to send him back to his former unit would represent deliberate indifference to a serious medical need is cognizable under the fifth amendment. *See Ingraham v. Wright, supra;* note 2, *supra.* The plaintiff at the moment is attached to the disciplinary barracks at Newport, a position akin to that of a pretrial detainee; indifference to his medical needs in this context is as unconstitutional as indifference to the medical needs of a civilian prisoner who has not yet been convicted of a crime. *See, e. g., Shannon v. Lester,* 519 F.2d 76 (6th Cir. 1975). The basis for concern remains the fact that refusal to grant needed medical care, or, as here, to make allowance for an individual's medical condition, "could well

---

**2.** This distinction between convicted prisoners and others may be essentially technical. As Justice White noted in his dissenting opinion in *Ingraham v. Wright,* the eighth amendment has sometimes been applied outside of criminal punishments. 430 U.S. at 688, 97 S.Ct. 1401. More significantly, by suggesting that the due process clause protects against bodily punishment imposed without an adjudication of guilt, the decision in *Ingraham v. Wright* merely re-

quires that a plaintiff not convicted of a crime plead violation of his right to due process, rather than of his eighth amendment rights. *Id.* at 689 n. 5, 97 S.Ct. 1401. Courts have generally held that the due process clause protects an individual from deprivation of necessary medical care. *See, e. g., Fitzke v. Shappell,* 468 F.2d 1072 (6th Cir. 1972); *McCollum v. Mayfield,* 130 F.Supp. 112 (N.D.Cal.1955).

result in the deprivation of life itself." *McCollum v. Mayfield,* 130 F.Supp. 112, 115 (N.D.Cal.1955). Even if upon return to his former unit the plaintiff no longer remained in what amounts to a pretrial detention status, if he suffers the serious medical deprivation which he alleges without due process the defendants must be held responsible because it will be as a result of their actions that the plaintiff is harmed.

■ The question becomes, therefore, whether the plaintiff has made a sufficient showing that these deprivations will occur without due process. An analysis of the record in this case indicates that, if the transfer were to occur today, it would indeed be without due process. As has already been discussed, the overwhelming weight of the evidence from the civilian doctors is to the effect that the plaintiff suffers a severe mental disability and, most significantly, that the single most undesirable act from the standpoint of the plaintiff's mental health would be to send him back to his former unit. Faced with the April 11 letter and the plaintiff's own claim, the defendants permitted the plaintiff to be examined by Dr. Mangrum. Dr. Mangrum concluded that the plaintiff was psychiatrically fit, and it is on the basis of his report that the defendants intend to return him to his former unit.

Dr. Mangrum's evaluation, however, is deficient in two very significant aspects. First, there existed no confidential relationship between Dr. Mangrum and the plaintiff; the plaintiff on several occasions was warned that anything he said could be used against him in legal proceedings. Because the plaintiff knew he faced the possibility of two different court-martial proceedings, there was no discussion between the two regarding the events which resulted in the plaintiff going AWOL. The Court finds it difficult to give much weight to the conclusions drawn from a psychiatric examination in which the patient withheld information which is potentially significant to a proper evaluation of his mental condition in order to protect his right against self-incrimina-

tion. Equally significantly, although Dr. Mangrum's reported noted the existence of the April 11 letter, at no point in his report did he indicate why he disagreed with its conclusions. Instead, he totally ignored its conclusions. This is particularly noteworthy in light of the limited time Dr. Mangrum examined the plaintiff (one hour on one occasion and ten minutes on another), the lack of confidentiality already discussed, and the failure of Dr. Mangrum to give the plaintiff any tests at all, such as those which the civilian doctors administered and relied upon in part for their conclusions. At a minimum, due process requires that where, as here, the potential risk is so great there be some indication as to why the defendant rejected the conclusions of the civilian doctors.

The defendants suggest, however, that notwithstanding the fact that the plaintiff has made a strong showing of success in his claim that he will be denied fundamental rights without due process, the Court has no authority to review a finding by service doctors that a serviceman is fit for duty. It is true that some courts have so held. *See United States v. Sowul,* 447 F.2d 1103 (9th Cir. 1971), *cert. denied,* 404 U.S. 1023, 92 S.Ct. 698, 30 L.Ed.2d 672 (1972); *Byrne v. Resor,* 412 F.2d 774 (3d Cir. 1969); *Weber v. Clifford,* 289 F.Supp. 960 (D.Md.1968). However, these cases are distinguishable. In *United States v. Sowul, supra,* the Court refused to order that an inductee be given a psychiatric examination, noting that ordinarily the question of mental fitness is one for the military. However, the court was careful to note that a court may inquire into physical fitness in the presence of unusual circumstances. In the present case there are such unusual circumstances: the plaintiff has a documented history of mental difficulties, apparently has received little consideration of this history from the defendants, and is likely to suffer the most grievous sort of loss if the court does not interfere to insure that full consideration is given to his problem. The plaintiff's case is quite different from that of a serviceman who merely claims he is mentally unable to cope with the service but who has presented

no evidence of such inability or of the consequences of retention. The latter situation appears to have existed in *Sowul.*

*Byrne v. Resor, supra,* is distinguishable on somewhat different grounds. There the Court refused to review the decision of an Army physician that the plaintiff was fit for duty solely because the report of a private physician disagreed. By contrast, the present case does not involve simple disagreement; rather, it concerns the near total failure of the defendants to consider a prior civilian diagnosis or to make their own independent evaluation. If Dr. Mangrum's report indicated that he considered the report of the civilian doctors, why he rejected their conclusions, and that he had given the plaintiff a complete examination, then the Court would be faced with a situation indistinguishable from that in *Byrne* and might very well decline to review the decision.

■ *Weber v. Clifford, supra,* involved a situation very similar to the present case. There the plaintiff alleged that if he was sent to Vietnam he would face a significant risk of contracting a streptococcal infection likely to cause him serious and permanent damage due to his history of rheumatic fever. It is true that notwithstanding strong medical evidence to this effect the court refused to override the Army's decision. However, the court did so in full recognition that the military authorities had voluntarily decided to give the plaintiff another physical examination and review the decision to send him to Vietnam. Furthermore, it appears that an administrative remedy existed which plaintiff was able to pursue prior to transfer to Vietnam. *See McAbee v. Martinez,* D.C., 291 F.Supp. 77, 79 n. 4 and accompanying text. Ultimately the Army in fact changed its evaluation and sent the plaintiff to Korea instead. Here, in contrast, the defendants have not voluntarily undertaken a review of the plaintiff's case, and as has already been discussed, it appears impossible to pursue the administrative remedy prior to transfer. In such a context, the Court concludes that it has the power to exercise at least a limited review to insure that the plaintiff will be able to exercise his administrative remedies. Indeed, the ability to pursue these remedies may be the due process to which plaintiff is entitled.

Finally, in addition to the factual distinguishability of these cases, it must be noted that all of them antedate the decision in *Mindes v. Seaman, supra,* and the adoption of the *Mindes* approach by the First Circuit in *Pauls v. Secretary of the Air Force, supra.* Consequently, the conclusion in these cases not to review was not based upon the careful balancing which the *Mindes* approach mandates. Application of this approach in the present case suggests that the nature and strength of plaintiff's claim is such that reviewability should exist.

Consequently, the Court concludes that the plaintiff has stated a constitutional claim of sufficient magnitude to favor review of the decision to return him to his former unit. This claim lies in the allegation that the return will result in the deprivation of life, liberty, and adequate medical care without due process. Furthermore, the plaintiff has shown a high likelihood of success in proving that, at least at this point, he has been denied the process due him, although it may be that once he is able to exhaust administrative remedies sufficient due process to pass constitutional muster will have been furnished.

### Potential Injury to the Plaintiff If No Relief Is Granted

The plaintiff alleges deprivation of fundamental rights, *i. e.,* his right to life, not simply the deprivation of a promotion or of the opportunity to serve in the military. As already discussed, the potential injury to him if no relief is granted is the greatest imaginable: he might very well be dead. The Court concludes that this factor strongly militates in favor of review.

### The Type and Degree of Expected Interference with the Military

As the *Mindes* court noted, there will always be some interference when review is granted. The real question is whether the

interference would seriously impede the military in performing vital duties. *Mindes, supra,* 453 F.2d at 201. For example, interfering with the decision to deploy an entire battalion of men to a combat zone is likely to constitute improper interference. On the other hand, interfering with the assignment of one individual to a particular post in peacetime is far more limited. The latter situation applies here. The plaintiff does not seek to avoid a combat assignment, nor does he seek to avoid all military duty. Nothing on the record indicates that the plaintiff's duties and skills are such that his squadron cannot bear his absence. Furthermore, it is possible to limit the scope of the interference which does occur by restricting it both in time, to the time needed to pursue administrative remedies, and in scope, by allowing the defendants to institute any court martial proceedings against the plaintiff which they deem appropriate and to transfer him to any post other than his former squadron. Because the requested interference will have no serious impact on the military, this factor also supports review by the Court.

### The Extent to Which Military Expertise and Discretion Are Involved

■ Normally, the duties and post of a particular serviceman are matters of military discretion and the courts will not revise duty orders. *See Orloff v. Willoughby, supra,* 345 U.S. at 94, 73 S.Ct. 534. The military is usually in the best position to determine whether an individual possesses the requisite skill to perform a certain task, and similarly is in the best position to determine where in the interests of the military an individual should perform these tasks. Here, however, what is involved is essentially a medical judgment as to whether the plaintiff is psychologically fit to return to his former unit, an assignment which apparently triggered his recent hospitalization. The military has no particular expertise with regard to such a medical judgment. Indeed, in the present case the basis for the military's medical judgment is suspect, and at best that judgment, based on one interview of an hour and one of ten

minutes, and reached without access to the plaintiff's medical records, carries far less weight than that of the civilian doctors who have been treating him regularly. The Court must conclude that evaluation of this factor does not militate against review of the plaintiff's claim.

■ This discussion of the applicability of the *Mindes* criteria to the facts of this case leads the Court to conclude that not only can it review the plaintiff's claim, but that it ought to do so. The plaintiff has alleged the deprivation of a constitutional right, and has no administrative remedies which he may with confidence pursue to fruition prior to suffering the harm which he seeks to prevent, *i. e.,* transfer back to his former unit with the resultant risk of suicide and/or homicide. He has raised a constitutional claim of the highest magnitude, one which implicates personal liberty, and has demonstrated a high likelihood of success. The potential injury to the plaintiff if the Court declines review is great, and the interference with military function is slight. Finally, military expertise and discretion are only slightly involved. Therefore, the Court concludes that notwithstanding the traditional judicial reluctance to interfere with the operation of the military, this is the unusual case where such involvement is proper. As a result, the motion to dismiss must be denied.

The next question is the scope of review to be applied to the decision challenged by the plaintiff. The scope of review should reflect the fact that there are two competing interests: that of the plaintiff, who claims a deprivation of constitutional rights, and that of the military, which claims a right to administer its own affairs, especially the assignment of personnel, without undue interference from the judiciary. Where the individual interest is high, and the military interest relatively weak, a greater scope of review is justified than where neither interest is paramount, or where military interest clearly predominates. An additional factor in determining the scope of review is the extent to which the court has independent expertise to eval-

uate the claim. Finally, whatever the judgment about the relative interests of the parties, this judgment should be supported by substantial evidence; unsubstantiated claims of an overriding interest should not be credited. *See generally* Haggerty, *supra,* at 195–96.

 In the present case the individual interest is high; as already discussed, there is a possibility of deprivation of life and/or liberty without due process. The plaintiff has presented a substantial amount of medical evidence which supports his allegation that transfer back to his former post will cause him to run the risk of suicide and/or homicide and will result in the deprivation of medical care. The only evidence to the contrary is the report of Dr. Mangrum, which, for the reasons already discussed, can be given little credit. On the other hand, the military interest is relatively weak; the plaintiff is not due to serve in combat, there is no evidence that his presence is critical to his unit, and there can be little need to immediately have the services of a potentially mentally unfit serviceman. Additionally, the defendants' judgment regarding the plaintiff's fitness appears unsupported by substantial evidence. Finally, the Court has at least as much expertise to evaluate the plaintiff's claim that the defendants' determination that he is psychologically fit for duty was reached in violation of due process as the military has. It is true that the Court does not have any particular expertise to determine what constitutes fitness for duty, and that this is a determination best left to the military, but it does have expertise to determine whether this judgment was reached by a method comporting with the requirements of due process. For example, the Court regularly must review disability claims under the Social Security Act, and in the process must evaluate whether a medical judgment was reached by means consistent with due process, *i. e.,* whether it is supported by substantial evidence after consideration of the record as a whole. Consequently, the Court concludes that in this case, where the plaintiff alleges immediate, egregious harm should he be returned to his former unit,

the Court may broadly review the process by which the defendants reached the determination that the plaintiff is psychologically fit for duty at his former post.

 Application of this scope of review leads inexorably to the conclusion that as the facts in this case now stand the plaintiff has been denied due process. Notwithstanding the April 11 report by Drs. Schoonover and Shulman, which indicated that the worst possible thing the defendants could do to the plaintiff would be to return him to his former unit, Dr. Mangrum found him psychologically fit for duty. Most significantly, he at no time indicated why he rejected the conclusions of the April 11 letter, nor did he even indicate that the letter contained conclusions contrary to his. Additionally, as has already been discussed, due to the lack of physician-patient confidentiality and the limited amount of time he interviewed the plaintiff, his evaluation is entitled to little weight. The Court cannot conclude that the medical evaluation given to the plaintiff by defendants, through Dr. Mangrum, meets the minimum standard of due process which the plaintiff has a right to receive before being returned to a post where he faces a significant risk of suicide and/or homicide. At the very least, there should be some indication as to why the evaluations of Dr. Schoonover and Dr. Shulman were rejected.

Notwithstanding the failure of the defendants to give proper consideration to the plaintiff's medical claim so far, the denial of due process is not total. According to the defendants, plaintiff does have an administrative remedy in Article 138 of the Uniform Code of Military Justice, 10 U.S.C. § 938. As already discussed, there was an insufficient amount of time to invoke this remedy before the plaintiff expected to be returned to his former unit. Nonetheless, it would be improper for this Court to overrule the defendants' finding of psychological fitness without first requiring that this and any other administrative remedies be exhausted. By pursuing such remedies, the plaintiff may very well be able to convince

the defendants that his position is correct. Similarly, the defendants may be able to show that their evaluation is supported by substantial evidence, while insuring that the appropriate amount of due process is accorded the plaintiff's claim. The merits of this case will be significantly easier for this Court to evaluate following exhaustion of administrative remedies. It is better to insure that due process is provided rather than simply reverse a decision for failure to grant the appropriate amount of due process.

■ Consequently, the Court concludes that a preliminary injunction should issue which prevents the defendants from returning the plaintiff to his former unit while he exhausts his administrative remedies. There is no question that the requirements for issuing a preliminary injunction have been met: plaintiff has demonstrated a likelihood of success on the merits of his claim that he has, at least up to this point, been denied due process; he has shown that he is likely to suffer irreparable harm if the status quo is not preserved; the possible harm to the defendants is small; and public policy mandates the Court to protect against the possible deprivation of life without due process. In keeping with the policy of avoiding any more interference with the military than is absolutely necessary, this injunction must be limited to preventing the plaintiff's return to his former unit. There is no evidence to support any greater restriction on the defendants' normal discretion to assign personnel; furthermore, the plaintiff does not seek any greater restriction. Similarly, in view of plaintiff's scheduled discharge date of August 3, 1979, there is no reason to order any delay in the commencement of any court martial proceedings which the defendants deem proper to institute against the plaintiff arising out of his unauthorized absence or his alleged involvement in an assault prior to that absence. Finally, because the administrative process may resolve plaintiff's claim, once the plaintiff has exhausted his administrative remedies the defendants may move to have the plaintiff show cause why the preliminary injunction should not be dissolved.

The plaintiff shall pursue his remedies as quickly as possible.

The plaintiff is granted a preliminary injunction in keeping with the Court's Memorandum and Order of June 22, 1979. The motion to dismiss is denied.