**Joseph P. ORNATO, Plaintiff-Appellant,**

*v.*

**Martin HOFFMAN, Secretary of the Army and Commanding Officer, Reserve Components Personnel, Defendants-Appellees.**

**No. 342, Docket 76–6125.**

United States Court of Appeals, Second Circuit.

Argued Sept. 30, 1976.

Decided Dec. 2, 1976.

Steven J. Hyman, New York City (Kunstler & Hyman, New York City, of counsel), for plaintiff-appellant.

Michael H. Dolinger, Asst. U. S. Atty., S. D. N. Y., New York City (Robert B. Fiske, Jr., U. S. Atty. and Gary G. Cooper, Asst. U. S. Atty., S. D. N. Y., New York City, of counsel), for defendants-appellees.

Before FEINBERG, GURFEIN and VAN GRAAFEILAND, Circuit Judges.

GURFEIN, Circuit Judge:

This is an appeal from an order of the Southern District of New York (Goettel, *D. J.*) denying appellant's motion for a preliminary injunction to prevent the Army from ordering him to active duty.

Joseph Ornato enlisted in the Armed Forces Physicians Appointment and Residency Program, known as the "Berry Plan".[1] He was commissioned a first lieutenant in the United States Army Reserve in November 1971 after graduating from medical school. He is now a Captain. He was granted a four-year deferment to complete his post-graduate medical training.[2] He agreed to serve on active duty for two years upon expiration of the delay period.[3]

When June 30, 1976 rolled around he had completed a two-year residency in internal medicine and a two-year residency in cardiology. But he had also achieved a unique position in the medical life of the New York City community. He had become Director of the paramedic program at New York Hospital-Cornell University Medical Center in Manhattan, one of the largest hospitals in the City of New York. Dr. Ornato had developed a functioning paramedic program which involves a team of paramedics organized as a 24 hour emergency rescue team able to dispense on-the-scene specialized treatment to severely injured persons and cardiac arrest victims. In Manhattan this service is performed *only* by the New York Hospital and, by the attestation of that hospital, it is "a vital service to the community which has life and death implications since on-the-scene assistance to cardiac and seriously injured persons can mean the difference between their survival or death."

These paramedic teams with specialized training respond within a very few minutes to cardiac and other emergencies and can be summoned by the general public as well as physicians. The paramedic can render emergency treatment on the scene, including defibrillation. Critically ill patients can be transported by ambulance, helicopter, or with a specially outfitted "shock" van containing devices for respiratory and mechanical circulatory assistance. At the scene or during transport, the paramedics are in radio communication through sophisticated radio-telemetry with the hospital, specifically with Dr. Ornato who personally directs the therapy rendered by the paramedics by radio.

Accordingly, Dr. Ornato and the New York Hospital both requested his exemption from active duty based upon community hardship, or in lieu thereof, a further delay.

1. The "Berry Plan", which is implemented within the Department of the Army by Army Regulation 135–50, is a voluntary program which permits a physician to defer his active military service commitment until after completion of his residency training in his specialty. Following completion of his residency, the officer is obligated to serve for two years on active duty. In this way, the participant's educational process is not interrupted and he subsequently serves in his specialty rather than as a general medical officer.

2. Ornato formally requested deferment through June 30, 1976 and the Army approved his application. Pursuant to AR 135–50, however, Ornato was required to and did make separate requests for permission to continue his deferment for each of his three subsequent years of study. These applications were made in January, 1973, February, 1974 and January, 1975, respectively, and were all routinely granted.

3. In his separate applications for continuation of his deferment, *see* note 2 *supra,* as he had in his original application for appointment to the program, Ornato agreed to "serve on active duty for a period of 2 consecutive years upon expiration of the period of delay. . . ."

With regard to the request for exemption as well as delay,[4] Department of Defense Instruction 1205.1 reads:

> "Upon receipt of active duty orders any reserve officer and/or his employer may submit a request for a delay in entrance on active duty and/or exemption from active duty to a board authorized by the military department concerned to consider such cases. If such action results in disapproval, when the request is based on alleged community essentiality or hardship, the officer and/or his employer may submit an appeal to a higher authority within the military department concerned for final determination of the matter."

In its implementation of the Instruction, the Army sets no standards for the granting of exemption, but sets standards for the granting of *delay* as shown in the margin.[5]

## I

On June 4, 1976 an Army Delay and Exemption Board denied the application, finding that Ornato was not essential to his community, for the following reasons:

> "1) Other cardiologists in the New York metropolitan area could have been and could be trained to fill Dr. Ornato's positions. 2) Therefore, whether or not other persons are willing to assume those posts and whether or not the community wishes to allocate the funds necessary to attract and train a replacement are matters of the internal traits and policies of the New York metropolitan area generally and Manhattan specifically. 3) Consequently, Dr. Ornato can be replaced and other persons can perform his services within the terms of paragraph 2–19a, AR 601–25." [6]

The decision was not a balancing of Army need against community need. It was simply a decision that Dr. Ornato was not essential to his community.

The evidence from the most credible sources is overwhelming that Dr. Ornato is

---

**4.** These requests were made on February 9, 1976, approximately five months before Dr. Ornato was scheduled to go on active duty. The processing by the Army was delayed apparently because some required information was missing. Then the Army sought additional information and it was supplied in May, 1976. In their requests neither Dr. Ornato nor the New York Hospital had specified the length of delay sought.

**5.** Army Regulation 601–25, as amended April 1, 1976, provides in part as follows:

"2–1, b:

"Participants in the . . . AMEDD officer procurement programs may be delayed from entry on [active duty] for the reasons and periods discussed in this chapter and shown in table 2–1.

\*      \*      \*      \*      \*      \*

"2–4. *Delay Categories.* Delay categories authorized . . . AMEDD officer procurement program participants are—  . .

"c. *Category C.* Extreme personal or community hardship.

\*      \*      \*      \*      \*      \*

"Section IV. Essentiality of Community Hardship of Medical and Dental Program Participants.

"2–19. *Delay policy.* A USAR MC officer may request a Category C delay based on alleged essentiality or community hardship. . . .

"a. . . . Delay will be granted only when all of the following conditions are met:

"(1) The medical . . . service being performed is essential to the maintenance of health, safety or welfare in the officer's community.

"(2) The service cannot be performed by other physicians . . . residing in the area.

"(3) Prior to the date scheduled to report for active duty, the officer cannot be replaced in the community by another person who can perform the medical . . . service.

"(4) There *is reasonable* assurance that the officer can be replaced in the community within the authorized period of delay."

**6.** An Army Delay and Exemption Board, consisting of one medical and two non-medical officers recommended "disapproval of Captain Ornato's request for *exemption* from active duty." (Emphasis added.) Though there was no specific recommendation to deny the alternative request for *delay,* the findings relied on all related to the criteria for the granting of *delay.* In affirming the ruling of the Board on the appeal of Ornato and the New York Hospital, the Adjutant General noted only Ornato's "request for *exemption* from performing active duty." (Emphasis added.) The clear effect, however, of both rulings was to deny the request for delay as well.

unique and not immediately replaceable. The Medical Society of the County of New York noted that "although our society has many cardiologists, Doctor Ornato is the only one that we are aware of who is trained to direct a paramedic team program of this type." Other agencies that have supported the unique quality of his work are the Heart Association's Emergency Cardiac Care/Cardiopulmonary Resuscitation Committee, the Regional Emergency Medical Services Council of New York City and the Empire State Ambulance Service, Inc. which is a Life Support Systems Company.

New York Hospital stated to the Army board quite frankly that "we do not have the ability to train a replacement for Dr. Ornato at this time because of the lack of qualified applicants and limited funds."

The Adjutant General of the Army in affirming the Board's decision stated that "[t]he purpose of the Army's community hardship provision in regulations is not to reallocate the medical resources of the country but to insure that vital health services are not completely disrupted by the removal of an individual who cannot be replaced. While your services performed in this role may be desirable, it is clear that the community will not be denied the benefits of effective emergency medical care upon your departure."

The interpretation given to the Regulation by the Adjutant General could be read as limiting the community hardship provision to a small town or village with but a single physician, or perhaps a single surgeon. It is hard to imagine any other situation where health services would be "completely disrupted." The Adjutant General thus equates "essential to the maintenance of health" with a complete disruption of vital health services. New York Hospital protests in vain that the finding by the Army that the "community will not be denied the benefits of effective emergency

care" is contrary to its own experience and the documentary evidence in the file.

There will have been an estimated 41,400 deaths from cardiovascular disease in New York City in 1976. Over half of cardiac deaths are sudden (within two hours). There thus appears to be no disagreement as to the necessity for the paramedic emergency program or that its expansion should be fostered as a life-saving activity. On this record, it is, indeed, a close question whether there is any basis in fact on objective evidence that Dr. Ornato is not essential to the maintenance of the health of the community. This appeal tests to the limit the doctrine of judicial self-limitation.

II

Army Regulation 601–25 was completely revised on April 1, 1976 to become effective May 15, 1976. As noted, the Army Board's decision was on June 4, 1976. When our earlier cases, e. g., *United States ex rel. Schonbrun v. Commanding Officer,* 403 F.2d 371 (2d Cir. 1968), and *Roth v. Laird,* 446 F.2d 855 (2d Cir. 1971), were decided, the old regulation was in effect.

The differences we have been able to discern between the old regulation and the new regulation which governs here are, in essence, two. First, as we noted in *Schonbrun, supra,* the earlier regulation spoke in terms of authorization, 403 F.2d at 374, while the new regulation seems to use words of command.[7] On the other hand, the old regulation clearly included *exemption* as well as delay in the stated criteria, while the new regulation seems to use stated criteria only in relation to *delay.*

To the extent that a military regulation is mandatory, the courts will see that it is observed. *Hammond v. Lenfest,* 398 F.2d 705, 715–16 (2d Cir. 1968). *See Service v. Dulles,* 354 U.S. 363, 372, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957); *Nixon v. Secretary of the Navy,* 422 F.2d 934, 937 (2d Cir. 1970).[8]

---

7. "Delay *will be granted* when all of the following conditions are met." (Emphasis added.) In Army parlance "will be" generally speaks the voice of command, e. g., "You will proceed" etc. etc. *See Feliciano v. Laird,* 426 F.2d 424, 427 (2d Cir. 1970).

8. In *Smith v. Resor,* 406 F.2d 141 (2d Cir. 1969), we apparently went no further than to

■ The Administrative Procedure Act ("APA") applies to the Army in peacetime because the applicable exception under the Act is only for "military authority exercised in the field in time of war or in occupied territory." 5 U.S.C. § 551(1)G. The Congress apparently intended not to exempt Army personnel decisions except to the extent that the decision "is committed to agency discretion by law" so as to render inapplicable the provisions of § 10(e). 5 U.S.C. § 701(a)(2). *See* 4 Davis, *Administrative Law Treatise,* § 28.16, especially pp. 81–82 (1958 & 1970 Supp.).

The question of when a matter is committed to the unreviewable discretion of an agency is not an easy one. So far as the armed forces are concerned, the very structure of command suggests the answer. And the Congress has excepted from adherence to prescribed adjudication procedure " . . . the conduct of military or foreign affairs functions." 5 U.S.C. § 554(a)(4). Army personnel would normally be without remedy in the judicial forum save where habeas corpus is available, as in conscientious objector cases, *e. g., Gillette v. United States,* 401 U.S. 437, 91 S.Ct. 828, 28 L.Ed.2d 168 (1971), or where there is a breach of a self-imposed *procedural* regulation.[9] Neither exception is applicable here.

We must, therefore, turn to the question of whether there should be judicial review to determine if there is a basis in fact for the Army's decision in light of the *substantive* command of its own regulation. So far as complete *exemption* from active duty is concerned, we find no more standard in the new AR 601–25 than in the old. We refused to review "hardship" appeals to the courts under the old regulation by commissioned inactive reservists, *Schonbrun, supra,* including "Berry Plan" doctors, *Roth v. Laird,* 446 F.2d 855 (2d Cir. 1971).

One is tempted to distinguish those cases on the ground that they were forged while the nation was in an undeclared war when there was such urgent need for manpower. Today we are at peace, with a volunteer Army supplying the manpower needs of our defense establishment. Yet while we may assume that this court was conscious of the needs of the time and, indeed, that its decisions may have been influenced thereby, it remains true, nevertheless, that the *ratio decidendi* was broader in its scope in terms of administrative law.

■ In *Schonbrun* we recognized the possible applicability of the APA, and determined that these hardship matters were, in fact, "committed to agency discretion"; and while some of Judge Friendly's eloquent language describing a reserve as being always ready—*semper paramus*—may not be as pertinent today, we have concluded that, in the absence of intervening guidance from the Congress, the presumption of unreviewability remains the same.

The denial of *delay* is another matter, however. The above authorities do not necessarily deny review of that type of decision because much can be said in support of the contention that the Army with regard to delay has now mandated criteria by which it is bound. Moreover, in this case, it may be argued that there is no basis in fact, supported by objective evidence, that there are available trained cardiologists ready to take Dr. Ornato's place.

However, we need not reach the question of reviewability of the denial of delay in this case because not only has no tangible effort been made by the hospital to recruit a substitute, but it has admitted that it does not have the ability to train a replacement for Dr. Ornato at this time because of the lack of qualified applicants and limited funds. Thus, by its own concession, it cannot meet the fourth requirement of Category C, *supra,* note 4, namely, that "there is reasonable assurance that the officer can be

---

suggest review in cases where the armed forces failed to follow their own *procedure.*

**9.** In *Smith v. Resor, supra,* we expressed the rule in terms requiring the armed forces only to follow only their own *procedure.* Here there is no question raised concerning adherence to procedural form.

replaced in the community within the authorized period of delay."

■ The concession means that this criterion which had to be met to make the deferment mandatory was not met.

We must, reluctantly therefore, deny a writ of mandamus or other relief and affirm the judgment. We have explored this matter at some length because of the new regulation and the welcome state of peace that now prevails, as well as to induce the Army to take another look to see if some accommodation can be reached for New York Hospital with that broadness of vision that ought to govern the relations between our armed forces and our citizenry in peacetime.

Affirmed.