Dennis K. MASSER

v.

Commander M. B. CONNOLLY, Commander of the U.S.S. Portland; Rear Admiral Carl A. Brettschneider, Commanding Officer of the Philadelphia Naval Base; and Edward Hidalgo, Secretary of the Navy.

Civ. A. No. 80–4203.

United States District Court,
E. D. Pennsylvania.

March 25, 1981.

---

Jon Llewellyn Laudau, Philadelphia, Pa., for plaintiff.

Peter F. Vaira, U. S. Atty., Philadelphia, Pa., for defendants.

## OPINION AND ORDER

BECHTLE, District Judge.

Presently before the Court are cross motions for summary judgment in this civil action in which petitioner seeks a writ of *habeas corpus* discharging him from the United States Navy as a conscientious objector. Petitioner filed this action upon the Navy's denial of his application for discharge. For the reasons stated below, the Court finds no basis in fact for the Navy's decision. Accordingly, the writ will be issued.

## I. STATEMENT OF THE CASE

Petitioner became a born-again Christian in October of 1973. In April of 1976, he joined the Brethren in Christ Church, whose tenets include opposition to war in any form and opposition to military service. At first, petitioner did not fully accept these particular doctrines and on May 3, 1976, petitioner enlisted in the United States Navy for four years with an agreement to extend the enlistment for two years—a total of six years.

Petitioner first began to see a conflict between his religious beliefs and continued military service while still in basic training. Complaint, Ex. A, at 6. From September of 1976 to January of 1977, while stationed in San Diego, California, petitioner attended church three times a week and had regular fellowship with persons who could not attend church. Complaint, Ex. A, at 9. Also during this period, he met several times with a pastor who taught him that "Christ was the way of peace, and only peace." Complaint, Ex. D, at 3.

During 1977, while petitioner was serving in the Mediterranean aboard the U.S.S. PORTLAND, he read the Bible daily and joined Bible-study groups two or three times each week. Complaint, Ex. A, at 5. In January of 1979, petitioner became Protestant Lay Leader on the U.S.S. PORTLAND. Complaint, Ex. A, at 5.

In December of 1977, while in the Mediterranean aboard the U.S.S. PORTLAND, petitioner went to a chaplain for help, explaining that he "could not believe that God wanted us to kill." He asked the chaplain whether there was anything he could do. Complaint, Ex. D, at 3. The chaplain simply replied that one must obey the Government and that there was little to do but await the end of his term of enlistment. It was not until July of 1979 that petitioner first learned there was a procedure by which persons who became conscientious objectors while in the military could seek a discharge. Complaint, Ex. D, at 5. At this

time, however, petitioner was still not certain what course of action he should take.

Meanwhile, in mid-October of 1979, to provide additional income to support himself and his wife, petitioner took a part-time job as a gate guard in a university parking lot, checking parking stickers on cars as they entered the lot. In late-November of 1979, petitioner's employer asked him to carry a hand-gun and patrol the grounds. Petitioner "finally agreed." Complaint, Ex. D, at 7. In early-December, however, an incident occurred in which petitioner thought a fellow guard might have to use his gun. Petitioner then knew he had to quit the job and did so within the week despite his continuing need for additional income. *Id.*

By the end of December, 1979, petitioner knew he could not continue to serve in the military and began his application for discharge as a conscientious objector. The application was completed in March of 1980 and consisted of 11 pages of answers to the questions posed in Navy regulations. Complaint, Ex. A. *See* 32 C.F.R. § 730.18(e)(2). Also attached were 9 letters of support from individuals recommending that the Navy approve petitioner's application.

Pursuant to Navy regulations, petitioner was interviewed by a chaplain, a psychiatrist and an investigating officer. The chaplain submitted a letter stating that he found the petitioner to be sincere in his opposition to war in any form and, therefore, recommended discharge. Complaint, Ex. E. The psychiatrist found no signs of any mental illness or imbalance and described petitioner as "a sensitive, friendly, sincere young man who has a tendency to worry." Complaint, Ex. F. The investigating officer and petitioner's commanding officer, however, disagreed with the chaplain's recommendation. Since their recommendations are the principal reasons for the Navy's decision to deny petitioner a discharge, the Court will review them in detail.

The investigating officer first reviewed the facts which he believed required the Navy to deny the discharge. He noted that petitioner enlisted in the Navy two and one-half years after he joined the Brethren in Christ Church, despite having been "counseled many times on the Brethren in Christ Church's doctrinal views regarding military service." The investigating officer also noted that "[i]t was not until 2 months prior to the effective date of the 24 month extension of obligated service that [petitioner] submitted his application" and that he had never refused training or schooling. The investigating officer then itemized several additional facts which he believed supported denying the discharge: (1) that on April 20, 1979, petitioner requested assignment to the Mediterranean "to get another view of the Navy and to gain more experience"; (2) that petitioner accepted promotion to Petty Officer Second Class, "thus assuming greater military responsibility"; (3) that petitioner had held the job as a security guard discussed above, in which he had carried a gun; and, (4) that petitioner accepted assignment to the U.S. Atlantic Fleet "SOAP Team" in Norfolk, Virginia. Complaint, Ex. C, at 2. From these facts, the investigating officer concluded that there was "much doubt that [petitioner's] application is not merely an avoidance of military service." *Id.* The officer acknowledged that "[petitioner's] demeanor indicated that he is a very religious individual"; nevertheless, "the lack of formal religious training and knowledge of Brethren in Christ doctrine has made it difficult for [petitioner] to convincingly support his application for Conscientious Objector Status." *Id.* The officer then recommended that the Navy deny petitioner's application for discharge, stating: "The evidence presented during this investigation is too inconsistent to determine if [petitioner's] asserted beliefs are honestly and genuinely held. [Petitioner] has not proven . . . that his thinking and living in its totality both past and present are sincere." *Id.*

Petitioner's commanding officer reached the same result for the following reasons: "A thorough review of the hearing officer's [*sic*] report and enclosures thereto, [petitioner's] letter of rebuttal, and numerous

conversations with [petitioner] confirm that there are inconsistencies in his pursuit of Conscientious Objector Status and a thorough understanding of all doctrinal statements of his church are misunderstood or misinterpreted." Complaint, Ex. G.

Upon consideration of all of the facts stated above, the Navy denied the discharge. The letter notifying petitioner of the Navy's decision gave four reasons for the denial:

(1) The personnel "in the best position to objectively interview" petitioner—thereafter mentioning only the commanding officer and the investigating officer—did not "believe [petitioner to be] a sincere conscientious objector."

(2) Petitioner stated in his application that "I have a place as Head of Household and a responsibility to my family. I cannot do this if I am halfway across the world." The Navy concluded that the statement indicated that petitioner was merely dissatisfied with duty assignments and family separation and was not motivated by conscientious objector beliefs.

(3) The length of time between petitioner's becoming a Christian and his application for discharge, as well as petitioner's employment as ,a gun-carrying security guard in December of 1979, were "inconsistent with [his] asserted beliefs and clearly indicate[d] that [his] beliefs [were] not the primary controlling force in [his] life to qualify for designation as a conscientious objector."

(4) The "minimal amount of information" about his religious beliefs "indicate[d] that while [his] beliefs may be sincere, they are not held to the extent that continued service would deny [him] rest and peace." *See* Complaint, Ex. B.

## II. STANDARD OF REVIEW

█ Pursuant to Navy regulations, "an application for conscientious objector status may be approved for any member who is conscientiously opposed to participation in war in any form when opposition is founded on religious training and belief as defined in this article, and whose position is sincere

and deeply held." 32 C.F.R. § 730.18(*o*). *See also Clay v. United States,* 403 U.S. 698, 700, 91 S.Ct. 2068, 2070, 29 L.Ed.2d 810 (1971) (applying similar selective service regulations); *Shaffer v. Schlesinger,* 531 F.2d 124 (3d Cir. 1976) (applying similar Army regulations). In reviewing the Navy's determination that petitioner did not qualify for conscientious objector status, the Court must apply the narrow standard of review set forth in *Shaffer v. Schlesinger, supra* : "whether there is a basis in fact for the military's finding that an applicant has not presented a valid conscientious objector claim." *Id.* at 127. After reviewing each of the Navy's reasons for its decision, however, the Court has concluded that such decision cannot stand, even under the limited standard of review stated above.

## III. APPLICATION OF THE STANDARD

(A) *Recommendations of the Investigating Officer and the Commanding Officer*

█ The first reason offered by the Navy in support of the decision to refuse petitioner a conscientious objector discharge was that both the investigating officer and petitioner's commanding officer recommended that conscientious objector status be denied. The mere recommendations of these officers, however, cannot constitute the basis in fact needed to uphold the Navy's decision. The Court must find in the record at least some of the facts supporting those recommendations. Otherwise, the military could deny discharges on mistake or prejudice and leave the affected person without remedy.

The Court turns first to the reports of the investigating officer. The investigating officer initially stressed how long petitioner waited after he became a born-again Christian and joined the Brethren in Christ Church before making his decision to apply for a conscientious objector discharge. From this, the investigating officer inferred that petitioner is not sincerely opposed to war in any form. Such a conclusion does not follow. A fixed opposition to war in

any form may take years to develop; it may take only days. The timing is irrelevant. *Shaffer v. Schlesinger, supra*, at 130. Indeed, petitioner's delay is equally consistent with a conclusion that petitioner all the more carefully considered the conflict between his duty to his country and his duty to his conscience and finally determined that his conscience would not permit him to serve any longer.

The Navy's reliance on his enlisting after he became a born-again Christian is also misplaced. A person in the position of the petitioner here, who has suddenly come to a new and different religious understanding, is quite likely to develop a sincere, *doctrinally based* opposition to war only after he or she has had time to appreciate the full significance of the original religious awakening. Petitioner's experience in the Navy may well have stimulated the growth in his appreciation of his church's teaching. The profound effects of contact with the machines of war on a person's attitude toward war and religious beliefs is a subject of common knowledge.[1] Since the timing of petitioner's decision to seek a conscientious objector discharge is without significance, it cannot constitute a basis in fact supporting the Navy's decision. *See also Shaffer v. Schlesinger, supra*, at 130.

The investigating officer also noted that the petitioner *requested* his assignment to duty in the Mediterranean. However, since petitioner requested this assignment *before* he finally determined that his conscience prohibited him from serving in the Navy any longer, the making of the request is not probative of the state of his beliefs at the time he decided to apply for a discharge. Moreover, the mere request does not compel the conclusion that petitioner was an eager or even a willing serviceman. It is equally persuasive that petitioner may have decided that such a change of duty would help resolve his doubts. The investigating officer stated that he understood petitioner to have requested Mediterranean duty "in or-

der to get another view of the Navy." Complaint, Ex. C, at 2.

Petitioner's mere acceptance of promotions similarly does not provide a factual basis for the Navy's decision. Promotions mean not only greater responsibility but higher pay. Moreover, the Court fails to understand why accepting the responsibilities of Petty Officer Second Class logically suggests that the petitioner must not be truly opposed to war in any form. Such a rank hardly puts the petitioner in a policy-making position to determine the war-time naval strategy or tactics or automatically in a more combative role than he held before promotion. While Petty Officer Second Class *may* make petitioner directly or indirectly responsible for the destruction of a greater number of lives in time of war, it is improper and unrealistic simply to assume that the petitioner knew or even considered this possibility in accepting the promotion.

The investigating officer also relied upon petitioner's acceptance of a job as a college security guard carrying a gun. Closer examination of the facts of petitioner's employment reveals it to be wholly inadequate to support the Navy's decision. When petitioner was first hired, the job consisted of nothing more than checking stickers on cars in a college parking lot. It was only *after* petitioner had worked there a month that he was asked to carry a gun and roam the grounds. When he was later involved in an incident which nearly required a fellow guard to use force, petitioner resigned. These facts lend no support to the Navy's decision; but, to the contrary, they weigh against it.

The Court also fails to see any significance in petitioner's assignment to the "SOAP Team." At the time he accepted the assignment, petitioner was still bound to remain in the Navy. Petitioner's sincerity cannot be questioned merely because he accepted new duties, which he may well have sought only to make his continued service more bearable.

---

1. The Court notes, for example, the statement of Father William Thomas Cummings in a field sermon on Bataan during World War II: "There are no atheists in the fox holes." C. Romulo, I Saw the Fall of the Philippines 263 (1943).

■ Lastly, the investigating officer questioned petitioner's sincerity because of his lack of familiarity with the doctrines of the Church of the Brethren. It is well settled that one need not be a theologian to qualify as a conscientious objector. *Kemp v. Bradley,* 457 F.2d 627, 629 (8th Cir. 1972); *Helwick v. Laird,* 438 F.2d 959, 964 (5th Cir. 1971). It is enough that the petitioner, unlettered though he may be, possesses an understanding of church doctrine which leads him to a sincere opposition to war in any form.

Having found the investigating officer's report devoid of facts supporting the Navy's decision, the Court turns to the commanding officer's report. The commanding officer, however, relied in large part on the investigating officer's report and the "inconsistencies" suggested therein. Since the Court has already held that the investigating officer's report fails to provide a basis in fact for the Navy's decision, the commanding officer's report must also fail to the extent it incorporates by reference the report of the investigating officer. To the extent the commanding officer's report is based on his own impressions, garnered in personal interviews with the petitioner, the report is also insufficient. The report states no more than a conclusion that petitioner is not sincerely opposed to war in any form. This is not enough. To withstand judicial review, the report must contain facts which support that conclusion. If the conclusion is based on the applicant's lack of credibility, the report should at least note what aspect of petitioner's demeanor betrayed his true beliefs. Nothing like that is suggested here. Therefore, the Court must reject the commanding officer's report as a basis in fact for the Navy's decision.

(B) *Petitioner's Position as Head of Household*

The second reason for the Navy's decision was based on a statement that petitioner made in his application: "I have a place as Head of Household and a responsibility to my family." The Navy concluded from this that petitioner's request for discharge was based on his dissatisfaction with his duty assignments and family separation and not on his religious beliefs.

The Court cannot accept this inference. Petitioner's application makes it clear that his desire to return to his family had nothing to do with dissatisfaction with the Navy. On the contrary, petitioner sought merely to fulfill his appointed role in the family as taught by his religion. This is explained in the remainder of the very paragraph from which the Navy excised the quoted sentence:

> I along [*sic*] am responsibility [*sic*] to Christ for my family. My wife is not, she is to submit to me, and I must submit to the Lord. She should not have to take the responsibility of running the home, it's not her place to do so.

Complaint, Ex. A, at 8. The Court cannot draw from this any inference that petitioner is merely dissatisfied with his assignments. Thus, the Court holds that the Navy's second reason for denying the discharge is without basis in fact.

(C) *Time Between Joining the Church and Requesting the Discharge; the Job as a Security Guard*

The third paragraph of the Navy's letter states two distinct reasons for denying the discharge. The first is based on petitioner's delay in applying for conscientious objector status after joining the Brethren in Christ Church; the second is based on petitioner's acceptance of the job as a security guard. The Court has already discussed and rejected both of these facts as bases for the Navy's decision in the Court's earlier examination of the investigating officer's report. There is no need to rehash that discussion. The proffered reason simply does not have a basis in fact.

(D) *The Minimum Amount of Information on the Application*

The Navy's fourth and final ground for denying petitioner's request is that petitioner's application contained a minimal amount of information and that, "while [his] beliefs may be sincere," petitioner's application did

not demonstrate that continued service "would deny [him] rest and peace." Complaint, Ex. B, at 2. The Court holds that this is no reason to deny petitioner a conscientious objector discharge. First, petitioner's application, which was 11 pages long, contained more than enough information to support a decision that petitioner was eligible for discharge. Indeed, the application is admirably succinct, containing concise answers with pertinent information. What more the Navy could want is unimaginable.

■ Furthermore, there is no requirement that an applicant for a conscientious objector discharge must show that continued service would "deny [him] rest and peace." Petitioner need only show that he is sincere in his opposition to war in any form. Thus, the Navy's last reason for denying petitioner's discharge has no basis in fact.

## IV. CONCLUSION

The Court is convinced that the petitioner amply demonstrated that he was qualified for a discharge as a conscientious objector. For all the reasons discussed above, the Navy's decision to the contrary has no basis in fact. The Court will, therefore, grant petitioner's request for a writ of *habeas corpus* releasing him from the custody of the defendants. An appropriate Order will be entered.