**STS3 William P. CHAPIN**

v.

**Honorable James WEBB, Secretary of the Navy, et al.**

**Civ. No. H–88–46 (PCD).**

United States District Court, D. Connecticut.

Dec. 20, 1988.

---

Brian S. Mead, Mead & Herman, Quine-baug, Conn., for plaintiff.

Nancy L. Griffin, Asst. U.S. Atty., New Haven, Conn., for defendants.

## RULING ON CROSS–MOTIONS FOR SUMMARY JUDGMENT

DORSEY, District Judge.

Petitioner, William P. Chapin, a Navy Petty Officer, seeks habeas corpus relief in the form of an honorable discharge from further military service as a conscientious objector or, alternatively, that he suffers from a personality disorder. Respondents, the Secretary of the Navy and two Navy officers ("the Navy"), claim authority over petitioner.

### Background

Petitioner enlisted in the United States Navy in June 1984. His service record reflects training from 1984 to May 1986 at Naval facilities in San Diego, California; Pensacola, Florida; and Groton, Connecticut.[1] In May 1986, petitioner reported to the submarine USS Andrew Jackson for sea duty. During petitioner's first patrol on the Jackson, he observed nuclear weapons, an experience which he claims crystallized his beliefs into opposition to participation in war.[2] See Record at 15, 21.

Petitioner was referred for psychiatric evaluation when his views were learned. Record at 15. The psychiatrist, Dr. Giannandrea, found "no psychiatric illness that this request [for conscientious objector status] emanates from," but suggested that psychiatric evaluation and testing supported the existence of a severe personality disorder. Record at 14. On February 18, 1987, petitioner formally applied for discharge as a conscientious objector under ¶ 1860120 of the Naval Military Personnel

---

1. Respondents' Exhibit A at 25 (Petitioner's History of Assignments). Respondents' Exhibit A is the Navy administrative record of petitioner's application for discharge as a conscientious objector. Hereafter, it is cited as "Record at (page #)."

2. Petitioner's formal request to the Navy for a discharge explained:

> On joining the Navy I began to learn more directly what the military was about, but still did not realize fully until actually going on the patrol aboard the USS ANDREW JACKSON (SSBN 619). During that time I was forced to re-examine my values and found that not only did I not belong on the USS ANDREW JACKSON (SSBN 619), I had no place in the military at all and never did. Record at 12.

Manual ("NMPM").[3] *See* Record at 11–12 (Request for C.O. Status). The application described in part the nature and basis for his beliefs:

A military body's sole purpose is to ready itself to wage war. I have no intention of participating in that practice and I am seeking separation from it.

. . . .

Membership in a military organization is indicative of a willingness to participate in a war should the government deem it necessary. I will not participate in war. I will not participate in waiting to wage war. This conviction became concrete during my last patrol.

. . . .

Use of force should be a last resort, and then only sufficient force to defend yourself o[r] someone near you from harm.

*Id.* (enumerations omitted).

Petitioner was interviewed twice by Chaplain Richard Day, who reported as required by NMPM, ¶ 1860120.6, and concluded that: "[petitioner's] consentious [sic] objection to war is based primarily on his political assumption that his release from the Navy will be seen as his witness to the total evil of war. He is, in my opinion sincere in his belief that war is evil. His views stem, as I see it, not from religious training and belief but rather from the political decisions and policies of the President and Congress necessitating the military." Record at 18. Based on these conclusions, the Chaplain recommended that petitioner's request be denied "on the grounds that his views against war are not founded on his religious training and belief as delineated in [NMPM, ¶ 1860120]." *Id.*

The investigating officer, Lt. Loretta Spillane, held a hearing on March 30, 1987. Petitioner testified without counsel and presented no other evidence. Lt. Spillane considered the psychiatrist's and chaplain's reports, along with petitioner's application and testimony, and recommended that petitioner's request be denied for three reasons. First, she noted that petitioner had expressed willingness to fight in self-defense, defense of others, or defense of his country, but not as a serviceman. She therefore concluded that petitioner "does not object to participating in war per se, rather he desires to choose both the war and the manner in which he will participate." *Id.* at 8. Second, referring to petitioner's views on military and foreign policy, Lt. Spillane found that the source of his objection to participating in war was neither "religious training and belief" nor "moral or ethical beliefs of equal strength and devotion of a traditional religious conviction," but were "pervasively political in nature." *Id.* at 9. Third, Lt. Spillane found that petitioner had not met his burden of establishing that his conscientious objection convictions were sincerely held. She noted that he presented no supporting letters or testimony from others, that his beliefs were not gained through study, training, contemplation or comparable activity, and he had not otherwise conducted himself consistent with his convictions. *Id.* Petitioner's commanding officer forwarded this report, petitioner's request, and the record to the Commander, Naval Military Personnel, adding an endorsement recommending denial of the request. On July 10, 1987, petitioner's request was denied by the Commander of Naval Military Personnel for the following reasons:

1. that those best able to evaluate the request (i.e. the commanding officer, chaplain, and investigating officer) were not convinced that he qualified as a conscientious objector;

2. that his application contained minimal supporting information and indicated that his beliefs "are not held to the extent that continued service would deny [him] rest and peace;"

3. that he is not opposed to participation in all war, but rather is a "selective objector;"

4. that his beliefs do not meet the requirement that they be gained through training, study, contemplation or other ac-

---

**3.** Respondents submitted the relevant NMPM sections as Exhibit B to their memorandum. The manual implements regulations promul- gated by the Department of Defense, 32 C.F.R. Part 75 (Conscientious Objectors).

tivities comparable in rigor and dedication to the processes by which traditional religious convictions are formulated and were not "firmed, fixed, or the primary controlling force in [petitioner's] life." *Id.* at 5–6. There was no finding that petitioner's beliefs are not sincerely held.

After petitioner submitted a rebuttal, the Navy reaffirmed its decision. Petitioner now argues that he should have been discharged either because of his alleged personality disorder or as a conscientious objector. The petition is before the court on the parties' cross-motions for summary judgment.

*Review of Petitioner's Personality Disorder Claim*

Petitioner argues that the Navy itself has diagnosed him as suffering from a personality disorder and he is thereby entitled to discharge under NMPM, ¶ 3620200.1.f(3).[4] Respondents contend that the regulation vests no rights in petitioner and that the decision not to discharge him under the regulation is not subject to judicial review.

■ To the extent a military regulation is mandatory, it will be enforced by the courts. *Ornato v. Hoffman,* 546 F.2d 10, 13 (2d Cir.1976); *see Smith v. Resor,* 406 F.2d 141, 146 (2d Cir.1969) (military must observe own procedures). Thus, were petitioner correct that the NMPM requires the separation of personnel suffering from personality disorders, then his claim—that the Navy's recognition of his illness obliges it to discharge him—would be subject to judicial review. However, where a matter is "committed to agency discretion" by statute or regulations which do not mandate action, the agency's exercise of that discretion is not subject to judicial review. *See Ornato,* 546 F.2d at 13–14; *Smith,* 406 F.2d at 145; *United States ex rel. Schonbrun v. Commanding Officer,* 403 F.2d 371, 374 n. 2 (2d Cir.1968), *cert. denied,* 394 U.S. 929, 89 S.Ct. 1195, 22 L.Ed.2d 460 (1969); *cf.* 5 U.S.C. § 701(a)(2).

■ Assuming that petitioner does suffer from a personality disorder, the reg-

ulations he cites do not bind the Navy to discharge him. Indeed, automatic discharge is not mandated under any set of circumstances, even where a service member has been evaluated as "being self-destructive and/or a continuing danger to him or herself and others." NMPM, ¶ 3620200.1.f(3). In contrast to conscientious objectors, who may request discharge on the basis of their beliefs, a service member may not initiate discharge on the basis of a personality disorder. *Compare* NMPM, ¶ 1860120.1 and .4b *with* 3620200.1; *cf.* 32 C.F.R. § 75.4(a) (conscientious objector request "will be approved to the extent practicable and equitable" within limitations imposed by regulations). Rather, the NMPM provides that separation for a personality disorder is to be made only for the "convenience of the government," NMPM, ¶ 3620200.1, and that "the commanding officer is the initial authority responsible for determining if and when a member shall be processed for separation by reason of convenience of the government due to personality disorder." NMPM, ¶ 3620200.1.f(3). The regulations do not establish substantive standards for this determination; they merely establish procedures for commanding officers to follow in initiating and documenting a discharge on the grounds of a personality disorder. Thus, despite a medical diagnosis that a severe personality disorder exists which renders a service member incapable of serving in the Navy, the commanding officer may not request discharge without: (1) counseling the member on his deficiencies and affording the member an opportunity to overcome them; and (2) documenting "specific examples of how the diagnosed disorder interferes with the performance of [the] member's duty." *Id.,* ¶ 3620200.1f(3) (evidence of reduction in performance which persists in spite of command attempt to correct deficiencies through leadership), and .4.

■ Petitioner has not challenged the Navy's adherence to procedural form, but challenges the substantive decision not to

---

**4.** This claim is based entirely on the regulation and not on the Constitution or a statute.

discharge him. The lack of a substantive standard in the Navy's regulations, coupled with the structure of the military chain of command, strongly suggests that this decision is committed to the discretion of the commanding officer (in the first instance), subject to the approval of the Commander of Naval Military Personnel. *Compare Smith*, 406 F.2d at 145 (discretion vested in commanding officer to determine if reservist would be permitted to wear long hair); *Ornato*, 546 F.2d at 14 (hardship exemption). Here, the decision has been that the member is not incapable of being brought to function effectively in the service. Plaintiff claims that further leadership efforts are fruitless and that his disorder affirmatively interferes with the performance of his duty.

Courts have traditionally been reluctant to review discretionary personnel decisions by military officials. *See Smith*, 406 F.2d at 145; *Raderman v. Kaine*, 411 F.2d 1102, 1105–1106 (2d Cir.), *cert. dismissed*, 396 U.S. 976, 90 S.Ct. 467, 24 L.Ed.2d 447 (1969); *Ornato*, 546 F.2d at 13; *United States ex rel. Schonbrun*, 403 F.2d 371; *cf. Maier v. Orr*, 754 F.2d 973, 984 (Fed.Cir. 1985) (absent constitutional or regulatory violations, responsibility for determining fitness of service persons is that of the armed forces, not of the courts); *Reaves v. Ainsworth*, 219 U.S. 296, 31 S.Ct. 230, 55 L.Ed. 225 (1911) (declinging to review discharge for mental unfitness). It does not appear that any federal court has ever reviewed the merits of the military's refusal to discharge an active-duty serviceman on the grounds of mental unfitness.[5] One court has intervened to prevent the Navy from returning an airman to his overseas unit on the basis of a claim of mental instability. *Cushing v. Tetter*, 478 F.Supp. 960 (D.R.I.1979). However, *Cushing* involved extreme circumstances which are not present here: the airman presented medical evidence, not rebutted by the Navy, that if forced to return to his former unit he was at significant risk of committing suicide or homicide because of conflicts with his commanding officer. *Id.* at 964, 968. He asserted a claim based upon constitutional due process and the denial of medical attention, not merely on violation of military regulations, and did not seek complete discharge from all military service. The court enjoined the Navy only from returning the airman to his former unit while he exhausted his administrative remedies, placing no other restrictions on his assignment and permitting court-martial proceedings to go forward. *Id.* at 973. Thus, even in the narrow circumstances presented in *Cushing*, the court did not undertake full review on the merits but preserved the *status quo* until the airman could avail himself of Naval administrative remedies, in particular Article 138 of the Uniform Code of Military Justice, 10 U.S.C. § 938.[6] The court granted the injunction

---

**5.** The issue of whether such decisions are reviewable was presented to the Second Circuit, but not decided, in *Baldwin v. Cram*, 522 F.2d 910 (2d Cir.1975). In *Baldwin*, a National Guardsman claimed that he was psychologically unfit and sought to be discharged pursuant to Army regulations providing for the discharge of persons "unfit" or "unsuitable" for military service. However, before the military's evaluation process had been completed, the Guardsman went AWOL; as a result he was reassigned to active duty. The court did not reach the questions of whether the regulations were enforceable or whether there was jurisdiction to review the Army's action, finding that the guardsman was estopped from asserting a claim based on the regulations because his absence had prevented the Army from compliance. *Id.* at 912 n. 8, 913.

**6.** 10 U.S.C. § 938 provides:

Any member of the armed forces who believes himself wronged by his commanding officer, and who, upon due application to that commanding officer, is refused redress, may complaint to any superior commissioned officer, who shall forward the complaint to the officer exercising general court-martial jurisdiction over the officer against whom it is made. The officer exercising general court-martial jurisdiction shall examine into the complaint and take proper measures for redressing the wrong complained of; and he shall, as soon as possible, send to the Secretary concerned a true statement of that complaint, with the proceedings had thereon.

Arguably, exhaustion of this remedy is required, if it is available to petitioner and would be sufficient to provide relief. *See Mindes v. Seaman*, 453 F.2d 197, 201 (5th Cir.1971); *Cushing*, 478 F.Supp. at 966. However, because the applicable Navy regulations clearly leave the decision whether to initiate a discharge to the dis-

on the premise that due process had not been observed and that to return the airman to his unit would work irreparable harm. *Cushing*, 478 F.Supp. at 973. In contrast, and without criticism of the approach taken by *Cushing*, petitioner's circumstances and his claim for relief differ markedly from that case. *Compare* Record at 14 (no evidence of affective or psychotic disorder) *with Cushing*, 478 F.Supp. at 963–64.

In *Schonbrun*, 403 F.2d 371, the court declined to review the Army's denial of a reservist's request for exemption from active duty for "extreme personal and community hardship." *Id.* at 372. The court noted that under the applicable Army regulations,

> exemption is authorized but not required. The hardship must be 'extreme' and, while the regulations wisely give more specific content to this criterion, a good deal is necessarily left to the judgment of the commanding officer. In contrast to the yea or nay character of entitlement to the conscientious objection exemption, administration of the hardship exemption necessarily involves a balancing of the individual's claims against the nation's needs, and the balance may differ from time to time and from place to place in a manner beyond the competence of a court to decide.

*Id.* at 374–75. While the Army's failure to observe its own procedures might provide a basis for review, it was found that the substantive determination of hardship exemptions was "a subject on which civil review of discretionary action by the military should be declined—and this irrespective of the rubric under which the action is brought." *Id.* at 375 (note omitted).[7] *Accord Ornato*, 546 F.2d at 14 (no review of denial of hardship exemption).

The regulations at issue here vest more discretion in petitioner's commanding officer than those considered in *Schonbrun* and *Ornato*. His discretion is ongoing, subject to re-evaluation as various methods of assisting and encouraging the service member's adjustment to military duties are applied. Such an open-ended process is particularly unsuitable for judicial review.[8] In short, because the decision whether to discharge petitioner on the grounds of the diagnosis of a personality disorder was committed to the Navy's discretion by the applicable regulations, judicial review of the Navy's determination is unavailable.

*Conscientious Objector Status*

█ Denial of a conscientious objector discharge is subject to review when challenged by a petition for habeas corpus. *See, e.g., United States ex rel. Foster v. Schlesinger*, 520 F.2d 751 (2d Cir.1975); *Johnson v. Commanding Officer*, 423 F.Supp. 10 (D.Conn.), *aff'd without opinion*, 556 F.2d 573 (4th Cir.1976); *Smith v. Laird*, 486 F.2d 307 (10th Cir.1973). To qualify for a discharge as a conscientious

cretion of the commanding officer, an Article 138 proceeding might well be fruitless. As respondent has not suggested that Article 138 procedures should have been exhausted, they are not relied upon in denying review.

**7.** *Schonbrun* held that the Army's decision was unreviewable under any of the three possible avenues: habeas corpus; mandamus under 28 U.S.C. § 1361; and Section 10 of the Administrative Procedure Act, codified at 5 U.S.C. § 701(a)(2), suggesting that choice of avenues for review should not control the result. *Schonbrun*, 403 F.2d at 374, 375 n. 2.

**8.** For example, as the regulations require the commanding officer to document interference with performance and attempt to correct deficiencies through leadership, counseling, and even disciplinary action, it would be difficult for a court to determine when this process had been exhausted or even that the military would not eventually grant petitioner the relief he seeks. *See* NMPM, ¶ 3620200.1.f(3). In fact, petitioner has submitted, as Exhibits B, C and D to his affidavit, counseling/warning entries made in his service record by his superiors. Each of these warnings refers to the possibility of petitioner's future administrative separation. The court could only speculate whether these entries are a prelude to disciplinary action or the necessary groundwork for petitioner's discharge for a personality disorder. Certainly, the entries would support the latter course under § 3620200.1.f(3), which would be the less harsh and perhaps the more practical resolution. However, without authority derived from the Constitution, statute, or binding regulations, this court will not intrude upon the military's balance between its disciplinary, morale, and manpower needs on the one hand and petitioner's medical condition on the other.

objector, petitioner must establish that (1) he is opposed to participation in war in any form, *Gillette v. United States,* 401 U.S. 437, 443, 91 S.Ct. 828, 832, 28 L.Ed.2d 168 (1970); (2) his objection is founded upon religious principles, or upon ethical or moral beliefs which "play the role of … and function as a religion in [his] life," *Welsh v. United States,* 398 U.S. 333, 339, 90 S.Ct. 1792, 1796, 26 L.Ed.2d 308 (1970) (plurality opinion of Black, J.); *see also United States v. Seeger,* 380 U.S. 163, 176, 187, 85 S.Ct. 850, 859, 864, 13 L.Ed.2d 733 (1965); and (3) that his beliefs are sincerely held, *Welsh,* 398 U.S. at 340, 90 S.Ct. at 1796; *Witmer v. United States,* 348 U.S. 375, 75 S.Ct. 392, 99 L.Ed. 428 (1955); *Lovallo v. Resor,* 443 F.2d 1262, 1264 (2d Cir.1971). *See generally, Johnson,* 423 F.Supp. at 13, *aff'd,* 556 F.2d 573 (4th Cir.1976); NMPM, ¶ 1860120; 32 C.F.P. § 75.5 (1987). The denial of an application must be supported by a statement of reasons. *United States ex rel. Checkman v. Laird,* 469 F.2d 773, 780–81 (2d Cir.1972); *Johnson,* 423 F.Supp. at 13; 32 C.F.R. § 75.4(f). Judicial review of the denial is limited to consideration of the record before the Navy, *Armstrong v. Laird,* 456 F.2d 521, 522 (1st Cir.1972); *Keefer v. United States,* 313 F.2d 773, 776 (9th Cir.1963), and the scope of that review is limited to determining whether the record contains a "basis in fact" for the Navy's decision. *Koh v. Secretary,* 719 F.2d 1384, 1385 (9th Cir.1983); *Foster v. Schlesinger,* 520 F.2d 751, 755 (2d Cir. 1975); *United States ex rel. Checkman,* 469 F.2d at 778; *Johnson,* 423 F.Supp. at 13. The supporting facts found in the record need not have been specifically identified by the Navy, nor need they amount to "substantial evidence" for the denial. However, to sustain the decision a reviewing court must find some objective evidence in the record which relates to and supports the reasons stated in denying the application. *See United States ex rel. Checkman,* 469 F.2d at 781, 787 (reasons stated must be "logical" and must be supported by ob-

jective evidence in the record, even though not referred to by military board).

Several reasons were advanced for the finding that petitioner did not meet the conscientious objector criteria. These reasons must each be examined for a "basis in fact" support by some objective evidence in the record.

■■■■ The first reason advanced was that the chaplain, the investigating officer and petitioner's commanding officer all recommended that the request be denied. Absent objective underlying factual substantiation, these recommendations cannot constitute the basis in fact necessary to uphold the denial. *See, e.g., Masser v. Connolly,* 514 F.Supp. 734, 737 (E.D.Pa.1981).[9] The recommendation of the commanding officer must be discounted. He did not interview petitioner personally and stated no separate reasons for his recommendation. *See United States ex rel. Checkman,* 469 F.2d at 784.

■■■■ The chaplain's recommendation was based upon two interviews. The chaplain found petitioner "sincerely holds these views opposing the military and his participation in it." Record at 18. However, he stressed petitioner's concern for the possibility of use of military power which arose not prior to enlistment and training but only while on his last patrol. From this, and the fact that petitioner had not previously professed a belief in God nor currently practiced such a belief in a concrete way, the chaplain inferred that "[petitioner's] views stem, as I see it, not from religious training and belief but rather from the political decisions and policies of the President and Congress necessitating the military." *Id.* The timing of the formation of petitioner's beliefs is of limited weight, as when the beliefs are formed is not determinative of either their legitimacy or their sincerity. *See Shaffer v. Schlesinger,* 531 F.2d 124, 130 (3d Cir.1976); *United States ex rel. Checkman,* 469 F.2d at 786. Beliefs formed in the face of fire are legitimately

---

**9.** Prior cases have indicated the insufficiency of the armed services' apparent tendency to rely, in rejecting conscientious objector applications, upon the unarticulated recommendations of reviewing officers. *See, e.g., United States ex rel. Checkman,* 469 F.2d at 784–85; *Masser,* 514 F.Supp. at 739.

suspect, as there is then a possible motive for their formation and potential excuse from the exposure to danger. Although delay in filing an application for discharge may be considered in determining petitioner's sincerity, petitioner made his request almost immediately after returning from the patrol on which he claims his beliefs crystallized and this cannot count against him. *Cf. United States ex rel. Checkman*, 469 F.2d at 786; *United States ex rel. Donham v. Resor*, 436 F.2d 751, 754 (2d Cir.1971) (delay in filing application after crystallization of belief properly taken into account). The chaplain did believe that petitioner's views were sincerely held.

 Further, it appears that the chaplain may have misapplied the "religious training and belief" standards set out in *Welsh*, by focusing on petitioner's objections to national military policy. A policy objection, is, in reality, an alternative explanation for the end result he seeks, i.e., discharge from the Navy, does not invalidate sincerely held beliefs. The chaplain stated that petitioner's belief in God "seemed to me, to be an additional idea he might use to strengthen his request for a discharge," he did not identify support for this finding in petitioner's statements, nor did he find that petitioner's belief in God was insincere. A person is not disqualified from conscientious objector status merely because he holds strong political views. *See Welsh*, 398 U.S. at 342, 90 S.Ct. at 1797. Thus, what the chaplain has found was two-fold. One was sincerely held beliefs against war or the preparations for war. The second was that those beliefs were based on political views more than his religious views. The chaplain's report thus advances a subjective view of the basis for petitioner's objecting to further naval service. It could not provide a lawful basis in fact for the Navy's decision.

The investigating officer, Lt. Spillane, recommended denial of the application for three reasons. The Navy apparently did not adopt her finding that petitioner had not established his sincerity. *See* Record

at 5, ¶ 2.b; 9. Lt. Spillane's other conclusions, that petitioner's opposition to participation in all war and that his beliefs are neither based on religious training and belief nor on moral or ethical beliefs of equal strength, were essentially restated by the Navy and will be discussed independently below. *See* Record at 8, ¶ 3; 9, ¶ 4 (investigating officer's conclusions); *compare* Record at 5, ¶ 2c–d.

 Respondents' second reason for rejecting the application referred to the "minimal amount of information" contained in the request and stated that petitioner's beliefs are "not held to the extent that continued service would deny [him] rest and peace." Record at 5, ¶ 2.b. Petitioner has the burden of making out at least a *prima facie* qualification for conscientious objector status. A paucity of supporting evidence can be an objective fact reflected in the record and relevant to a petitioner's meeting his burden. However, the Navy's determination must rest upon an objective basis in fact in the record, not on what is not in the record. Denial based on the absence of information, without specifying what is missing, is arbitrary and cannot provide a basis in fact. *Cf. Masser*, 514 F.Supp. at 739–40 (rejecting "minimal information" as basis in fact). Similarly, the Navy's statement that continued service would not deny petitioner "rest or peace" is speculative. It is not an element of entitlement to a conscientious objector discharge.[10] *Id.* at 740.

 Though not all of the reasons asserted are factually supported in the record, there is sufficient "basis in fact" to support respondents' conclusion that petitioner's beliefs are not "firmed, fixed, or the primary controlling force in [his] life" and that he had not proved that his beliefs were gained "through training, study, contemplation, or other activities comparable in rigor and dedication to the processes by which traditional religious convictions are

---

10. The apparently formulaic repetition of this language in prior cases, e.g., *Masser*, 514

F.Supp. at 739, does not render it any more legitimate as a "basis in fact."

formulated." [11] Record at 5–6. Essentially, respondent argues that petitioner's beliefs are not held with the strength of, and thus do not function as, religious convictions and that he lacked the depth of conviction required to warrant his discharge as a conscientious objector. *See, Johnson,* 423 F.Supp. at 14–15; *Welsh,* 398 U.S. at 340, 90 S.Ct. at 1796; *cf.* NMPM, ¶ 186012.2.b (defining "religious training and belief"); *but see Kemp v. Bradley,* 457 F.2d 627, 629 (8th Cir.1972) (applicant need not prove "depth of conviction," only sincerity).

Petitioner's original application did not refer to any religious origins of his objection but rather to the influence of his mother and to his experiences aboard the *USS Andrew Jackson* as the catalysts. Record at 12, ¶ 14. He is not a member of any particular religious sect or organization. Although to the chaplain and at his hearing he professed a belief in God, petitioner has disavowed his religious beliefs as the primary source of his convictions. Record at 3 (reply to disapproval of request for conscientious objector status). Petitioner's few references to religion merely stated his belief in the "traditional" God, *see* Record at 21, without ever stating what that belief requires of him. In fact, the record is devoid of any statement by petitioner that his religious beliefs require him to refrain from participation in war.

In *Welsh,* the Supreme Court extended the conscientious objector provision of the Universal Military Training and Service Act, Section 6(j), 50 U.S.C.App. § 456(j), to one who "deeply and sincerely holds beliefs that are purely ethical and moral in source and content but that nevertheless impose upon him a duty of conscience to refrain from participation in any war at any time." *Welsh,* 398 U.S. at 340, 90 S.Ct. at 1796 (Black, J. joined by three members of the court) and 345, 90 S.Ct. at 1799, (Harlan, J., adopting test announced by plurality). As explained in *Seeger,* 380 U.S. at 176, 85 S.Ct. at 859, and quoted with apparent approval in *Welsh,* 398 U.S. at 339, 90 S.Ct. at 1796; "The test might be stated in these words: A sincere and meaningful belief which occupies in the life of its possessor a place parallel to that filled by the God of those admittedly qualifying for the exemption comes within the statutory definition [of conscientious objection]." Thus, to qualify as a conscientious objector, petitioner must show that his beliefs play the role of a religion and function as a religion in his life. *Welsh,* 398 U.S. at 339–340, 90 S.Ct. at 1796–1797.

In reaching the conclusion that petitioner's beliefs do not qualify, the Navy properly could have considered the timing of the application, his willingness to perform his duties if the application is denied, the clarity of his beliefs, and whether he had taken action to conform his life to them. *Cf. Johnson,* 423 F.Supp. at 14. While the evidence is not overwhelming, the record contains a sufficient basis in fact for the determination that petitioner's beliefs, on the basis of which he seeks conscientious objector status, do not function as a religion in his life. *Welsh,* 398 U.S. at 340, 90 S.Ct. at 1796; *Johnson,* 423 F.Supp. at 14. Petitioner's application stated that "my daily life style has not changed as a result of changes in my convictions, and [I] currently have no idea what actions in the future I will take to support those views." Record at 12. A month and a half later, at the hearing before the investigating officer, petitioner did not articulate any ways in which he had conformed his life to his beliefs (other than seeking a discharge from the Navy) and did not state how he expected his life to change in the future because of them. He had not acted for the purpose of accomplishing them. [12] *See*

---

11. In the court's view, this reason essentially restates or subsumes the investigating officer's finding, on which the Navy also relied, that petitioner's application was not based upon "religious training and belief" or on "moral and ethical beliefs held with equal strength, and devotion of a traditional religious conviction." Record at 9.

12. Petitioner's affidavit states that he has now begun assisting the Center for Nonviolent Alternatives. However, this information post-dates the Navy's denial of his application and cannot be considered on review. At the time of the hearing, petitioner was not a member of, and had not contacted, any antiwar organization.

Record at 21. If discharged, he planned to return to Arizona and find a job, but stated no commitment to work to advance the cause he espouses. Record at 21. Responding to the application requirement that he demonstrate the consistency and depth of his beliefs, petitioner wrote that his beliefs were demonstrated by: "My standing by my convictions in spite of difficulties in obtaining procedures and information concerning this [conscientious objector] package, and pressuring by senior members." Record at 12, ¶ 18. *See* NMPM, ¶ 1869120.4.a(18). So far as the record reveals, petitioner had focused his beliefs only in relation to his application for discharge from the military without otherwise putting them into practice in his life. While it has been said that "one does not have to be St. Augustine or Thomas Acquinas to qualify as a conscientious objector," *Helwick v. Laird*, 438 F.2d 959, 964 (5th Cir.1971), the absence of actions to conform one's outward life to one's professed beliefs may be a measure of whether those beliefs are the functional equivalent of a religion.

Petitioner did not refer to any religious training which had taught him that all war is immoral. *See DeWalt v. Commanding Officer*, 476 F.2d 440, 442 (5th Cir.1973). He did not submit supporting letters or testimony of other persons as to his beliefs or conduct. His beliefs were not gained through training, study, or contemplation. Record at 9. Lt. Spillane described him as "guarded, hesitant, and evasive" and found his responses to hypothetical questions "superficial, indicating that he had not given the issues surrounding his beliefs much thought." While the investigating officer considered these factors primarily in support of her conclusion that petitioner had not established his sincerity, a finding not adopted by respondents, such considerations also apply to the nature and strength of petitioner's moral and ethical beliefs. Moreover, petitioner referred to political and policy justifications of his opposition to the military and war (including, for example, the apparent unpopularity of the Navy during his visit to Scotland, and his support of the so-called "SDI") without distinction

between these political views and the religious, moral, or ethical components of his beliefs. Only the latter may provide grounds for conscientious objector status.

The record supports the Navy's finding that petitioner's moral, ethical or religious beliefs have not crystallized into conscientious objection. The record sustains a finding that petitioner has merely reached his own "conclusion that he is a conscientious objector but without being able to formulate a reason." *Naill v. Alexander*, 631 F.2d 696, 699 (10th Cir.1980). His beliefs are vague and political. His specific objections to service in the military each relate to his view that it is obsolete or unpopular in other countries, or that it has not and cannot be limited to defensive activities. There was, in these factors, sufficient basis in fact for the Navy to conclude that these views do not qualify as "religious, moral, or ethical beliefs about what is right and wrong and ... [which are] held with the strength of traditional religious convictions" and which occupy in his life "a place parallel to that filled by ... God." *Welsh*, 398 U.S. at 340, 90 S.Ct. at 1796.

■ There was also a basis in fact for respondents' determination that petitioner is not a conscientious objector opposed to participation in all war. Although petitioner stated that he would not participate in any war, he differentiated between defensive wars such as World War II, which he considered are "justified" and offensive wars. Record at 20, 8. He stated that it was "okay" for others to participate in defensive wars and to defend the country, but that he himself would fight only as a citizen to defend himself or his home. A willingness on petitioner's part to use force to defend himself, or his home, could not disqualify him from the status he seeks. *Gillette v. United States*, 401 U.S. 437, 448, 91 S.Ct. 828, 835, 28 L.Ed.2d 168 (1971). However, since petitioner termed others' participation in such wars "justified" and "okay," it is not clear that he feels that his own participation in such a war would be morally and ethically wrong. He explained that he would not act as a military member because the military

"could stop being a protective force and could become an 'invading' force." Record at 20. His explanation implies that petitioner has no moral or ethical objection to a defensive war, merely the practical objection that it is difficult to confine war to defensive measures. Petitioner's other statements regarding his endorsement of a "truly defensive military," the "SDI" or Strategic Defense Initiative, and his feeling that a standing army is outdated, *see* Record at 20–21, are also susceptible to the interpretation that he is not opposed to participation in "defensive" wars on the basis on moral, ethical, or religious conviction, although he may sincerely be opposed to personal participation on the basis of considerations of policy and pragmatism. Petitioner's statements, and his position that some wars are "justified," provided sufficient basis in fact for the conclusion that his moral, ethical, and religious beliefs do not lead him to oppose participation in all war. *Cf. Rosenfeld v. Rumble*, 515 F.2d 498 (1st Cir.) (basis in fact where petitioner stated he would bear arms personally, though not as member of military, if hostile army crossed the borders with a purpose to exterminate Jews), *cert. denied*, 423 U.S. 911, 96 S.Ct. 214, 46 L.Ed.2d 139 (1975).

*Conclusion*

Considering the record as a whole, the court finds that the denial of petitioner's application for a conscientious objector discharge is grounded upon a basis in fact. In addition, the court has found no authority to review the Navy's failure to discharge petitioner under NMPM, ¶ 3620200 by reason of his personality disorder. Accordingly, the petition for writ of habeas corpus is denied.

SO ORDERED.